**UNITED STATES of America and Hercules, Incorporated, Plaintiffs,**

v.

**W. H. FORST, as State Tax Commissioner of and for the Commonwealth of Virginia, etc., et al., Defendants.**

Civ. A. No. 74–216.

United States District Court,
W. D. Virginia,
Roanoke Division.

Jan. 18, 1977.

Paul R. Thomson, U. S. Atty., W. D. Va., Roanoke, Va., John J. McCarthy, Tax Div., U. S. Dept. of Justice, Washington, D. C., Edwin C. Stone, Davis & Stone, Radford, Va., for plaintiffs.

J. Durwood Felton, III, Glenn R. Moore, Asst. Attys. Gen., Richmond, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

MacKENZIE, District Judge.

This action is before the Court on cross motions for summary judgment. The parties are in agreement that there is no genuine issue of fact; hence it is proper for the Court to grant summary judgment on the basis of the law and the affidavits and exhibits submitted with these motions, including the stipulation of facts agreed to previously in connection with a state administrative proceeding.

### FACTS

*A. Procedural History.*

On December 5, 1972 the Commonwealth's Tax Commissioner made an assessment against Hercules in connection with the Radford Army Ammunition Plant (RAAP) at Radford, Virginia, in the amount of $372,689.67 for the period September 1, 1966 to December 31, 1970. Thereafter, Hercules, pursuant to Code of Va. § 58–1118 (1950), applied for, and received, on March 29, 1974, a reduced tax assessment of $130,955.01. This complaint was filed on November 21, 1974 to test the validity of that reduced assessment.

The United States and Hercules seek a declaratory judgment that Hercules was not liable during the period between September 1, 1966 and December 31, 1970, and has not since been liable, to the Commonwealth of Virginia under the Virginia Retail Sales and Use Tax, Code of Va. § 58–441.1 *et seq.* (1950), to the extent that tangible personal property was purchased and used pursuant to its contract with the Department of the Army to operate the Radford Arsenal.

*B. The Relationship between Hercules and the United States.*

RAAP is an Army ordnance installation which consists of two tracts of land near Radford, Virginia. All of RAAP's land and fixtures are owned by the United States. Since 1949 Hercules, a publicly held Delaware corporation, has had a cost-plus-a-fixed fee contract (W–11–173–AMC–37(A)) to operate RAAP, where it manufactures military propellants and explosives on one tract and stores the finished product on the other until the United States requires its use.

Under the contract, Hercules was responsible for the procurement of not only the raw materials used in manufacture of military propellants and explosives, but also all other tangible personal property necessary to carry out its contract at RAAP. It was in connection with the purchase and use of this latter category of tangible personal property that the disputed tax was assessed.

Examples of such items include office equipment and supplies, building and grounds equipment supplies, safety prizes, miscellaneous tools, automotive supplies and repair parts, coal used in comfort heating, safety apparel worn by Hercules' employees, magazines which Hercules either published or had published for distribution to its employees, and hospital supplies. One of the magazines was the *Powder Press* published bi-weekly for the RAAP employees; another Hercules publication was *The Hercules Mixer* published monthly; and the third was *Family Safety* purchased from and published quarterly by the National Safety Council. The hospital supplies sought to be taxed included medicines and drugs which were dispersed and prescribed

by the RAAP hospital staff. This staff was employed by Hercules to render all medical treatment to Hercules employees as is customarily rendered in the emergency room of a hospital.

The state tax auditors excluded all equipment actually used in the manufacture of the propellants and explosives from the tax base. All inventory items actually used in the manufacture were also excluded. Those inventory items which were used in the administrative area and for the benefit of the administrative personnel were assessed by class on a percentage basis ranging from 0 percent to 100 percent depending on their orientation toward either the productive or administrative area.

All tangible personal property procured by Hercules under the contract (other than items furnished by the United States or small transactions not exceeding $2500.00) were procured under either a Purchase Order Form or a Subcontract Form. It appears to us that the Purchase Order Form must have been used in connection with the tangible personal property items assessed because the Subcontract Form was used primarily for the construction, repair, renovation, and painting of facilities at RAAP. The Purchase Order Form provided notice to all sellers that "[m]aterials ordered hereunder are to be used in the performance of Government Contract No. W–11–173–AMC–37(A)." An appendix was attached to this form which gave further notice that "[t]itle to all materials, tools, machinery, equipment and supplies furnished hereunder shall vest in the Government upon delivery by the Seller."

Hercules has been completely reimbursed for the full cost, including any state sales or use taxes paid on all items of tangible personal property for which the tax was assessed.

The United States has, under the contract, exercised a high degree of control over Hercules' operation of RAAP, including its procurement of the items for which the tax was assessed. During the liability period, there was an average of 72 permanent Government employees at RAAP.

The United States reserved the right to inspect all materials ordered by Hercules.

The concessions made by counsel during oral argument on these motions have substantially narrowed the issues presented to the Court. Counsel for the plaintiffs concedes that Hercules never acted as an agent for the United States in connection with the purchase or use of any of the tangible personal property items which have given rise to the tax. Counsel for the Commonwealth concedes that Hercules never had title to any of these items, but rather that title passed directly from the vendor to the United States.

## C. The Virginia Tax Statute.

The Virginia Retail Sales and Use Tax is basically a general tax on retail (or final) sales of tangible personal property. However, under Code of Va. § 58–441.6(p) sales to the United States are exempt. Therefore, the statute incorporates the Constitutional limitation against state taxation of the federal government and the basic constitutional and statutory issues become one.

It is not necessary for the purposes of this action to separately determine the validity of the tax on Hercules under the sales tax and under the use tax. In fact, the Commonwealth concedes that the Virginia use tax provision would not have permitted the assessment against Hercules unless it, Hercules, was the purchaser of the tangible personal property. Since we conclude, as commented upon hereafter, that the legal incidence of the Virginia sales tax is also on the purchaser, the issue is the same under each tax, i. e., who was the purchaser?

This result is not surprising once we view the two taxes as one comprehensive tax on sales, as the legislators no doubt intended. The Commonwealth cites us to § 1–109 of the *Virginia Retail Sales and Use Tax Rules and Regulations*, which provide in part:

> The use tax applies to tangible personal property used or consumed within the State . . . but purchased without this State, where the property would have been subject to the sales tax if it

had been purchased within this State. The use tax also applies where the purchase was made in this State but the applicable sales tax was not paid thereon.

The legal incidence of a tax on sales can be placed on either the seller or the purchaser. If the legal incidence were on the seller it would be clear that this tax is constitutional because obviously the United States was not the seller. Hence, we find that the legal incidence of the Virginia sales tax is on the purchaser. Although the seller is legally obligated to collect the tax from the purchaser, the statute makes the tax the legal debt of the purchaser. ". . . [W]here a state requires that its sales tax be passed on to the purchaser and be collected by the vendor from him, this establishes as a matter of law that the legal incidence of the tax falls upon the purchaser." *United States v. State Tax Commission of Mississippi,* 421 U.S. 599, 607, 95 S.Ct. 1872, 1878, 44 L.Ed.2d 404 (1975).

Under the Virginia statutes, only retail sales are taxed. Therefore, sales of raw materials to a manufacturer, which are to be used in the manufacture of other goods, Code of Va. § 58–441.6, and sales to a middleman, who later resells the goods to a merchant, Code of Va. § 58–441.2(c), are excluded.

## LAW

■ It is unconstitutional under *McCulloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819), for a state to directly tax the United States or one of its instrumentalities. Later cases have made it clear that the *McCulloch* prohibition was not designed to constitutionally protect the United States from ultimately bearing the cost of state taxation, e. g., *City of Detroit v. Murray Corporation of America,* 355 U.S. 491, 494, 78 S.Ct. 458, 461, 2 L.Ed.2d 441 (1958); *Kern-Limerick, Inc. v. Scurlock,* 347 U.S. 110, 122, 74 S.Ct. 403, 411, 98 L.Ed. 546 (1954); *State of Alabama v. King & Boozer,* 314 U.S. 1, 8, 62 S.Ct. 43, 45, 86 L.Ed. 3 (1941). Rather the *McCulloch* rule is designed to prevent the states from imposing restraints on the constitutional functions of the United

States by "hamstringing its power," interfering with its property, or discriminating "against the Federal Government, its property or those with whom it does business." *City of Detroit, supra,* at 510, 78 S.Ct. at 462. The Constitution leaves the fiscal decision as to whether the economic incidence of a state tax may be placed on the United States to the Congress. *United States v. City of Detroit,* 355 U.S. 466, 474, 78 S.Ct. 474, 479, 2 L.Ed.2d 424 (1958); *Kern-Limerick, supra* at 122–123, 74 S.Ct. at 411; *King & Boozer, supra* at 8, 62 S.Ct. at 45. In the absence of Congressional exemption, the Supreme Court has looked to see if the legal incidence of the state tax has been placed on the United States, its property or one of its instrumentalities.

■ The legal incidence of a sales tax may be placed by the state statute on either the seller or the purchaser. Since we concluded previously that Virginia has placed the legal incidence of its tax on the purchaser, the validity of the tax turns on the question as to who was the purchaser involved in the sales transactions upon which the tax was based. Whether the United States or its contractor was the purchaser depends on the contractual relationship between the two. A comparison between the opposite holdings in *King & Boozer, supra* at 9, 62 S.Ct. at 45, and *Kern-Limerick, supra* makes this clear.

In *King & Boozer,* 314 U.S. at 10, 62 S.Ct. at 46, the Supreme Court defined the purchaser of the items sold as "the person who orders and pays for them when the sale is for cash or who is legally obligated to pay for them if the sale is on credit." The key fact finding in that case, which upheld the state tax, was "that the contractors were to purchase in their own names and on their own credit . . . and that the Government was not bound by their purchase contract . . . ." That this fact finding was the crucial one was underscored by the Supreme Court's rationale for striking down the state sales tax in *Kern-Limerick, supra* at 119–123, 74 S.Ct. at 409–411. In that case the Supreme Court held that the contract between the United States and its

contractor, the request for bids, the purchase order forms and the course of business under the contract in the purchase of supplies all made clear that only the credit of the United States was bound by the purchasing agreements and that "no liability of the purchasing agent to the seller arises from the transaction." *Kern-Limerick, supra* at 121, 74 S.Ct. at 410. The Supreme Court has made it explicit that the contracting parties—that is, the United States and its contractor have the power, when Congress has not waived governmental immunity, to prevent the state taxation on the sales by altering the form of their contract to make the contractor the purchasing agent of the United States with the authority to bind the credit of the United States. *Id.* at 122, 74 S.Ct. at 411.

These two cases make it clear that it is not critical who holds title to the purchased items as between the United States and its contractor. Nor is the degree of control over the contractor that the United States exercises with respect to the purchases critical. The key factor is whose credit, between the United States and the contractor, is bound by the purchasing agreement with the seller. *King & Boozer, supra* at 13–14, 62 S.Ct. at 47; *Kern-Limerick, supra* at 118–123, 74 S.Ct. at 409–411.

■ The legal incidence of a state property tax can be placed by statute on the owner of the property or the person who enjoys the beneficial possession of the property either as a lessee or as a bailee. There is a line of Supreme Court cases which have held that the state may constitutionally tax a contractor's beneficial possession of property despite the fact that the United States owns the property, as long as only the contractor is liable for the paying of the tax, no effort is made to hold the United States or its property accountable, and the tax does not discriminate against the possessors of United States property. *United States v. City of Detroit*, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958), upheld a state tax on the corporate tenant of an industrial plant owned by the United States. *United States v. Township of Muskegon*, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958), upheld a state tax on the lessee and user of a manufacturing plant owned by the United States, which used the plant in the course of performing supply contracts it had with the United States. In *City of Detroit v. Murray Corporation of America*, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958), the Supreme Court upheld a state tax imposed on a subcontractor under a prime contract between two other private companies and the United States to manufacture airplanes. It was held in that case that the state could validly tax the subcontractor for its use or possession of the United States-owned personal property.

## CONCLUSIONS

■ It is clear from our analysis of the Virginia tax statute and its past application that it only taxes sales transactions. A sale is a necessary event before the tax can be imposed, and the tax is imposed only on the purchaser of the sale. The only necessity for the "use" tax provisions is to include within this sales tax those sales transactions which occur outside of the state but are to be used within the state by the purchaser. We need not inquire whether Hercules had beneficial possession of the purchased items since the legal incidence of this tax is not on the mere possessor of tangible personal property but rather on the purchaser of that property. If Hercules was the purchaser, there is no sovereign immunity problem.

■ The United States has conceded that Hercules has not acted as its purchasing agent for the tangible personal property here involved and which was not used in the manufacture of explosives. It would have been difficult for the United States to maintain otherwise in light of the language in the Contract, Article 1–B:

1. The Contractor, as an independent Contractor and not as an agent of the Government, shall . . . furnish all personnel, labor, equipment, supplies, materials, consultation, and other services, except such . . . as may be furnished by the Government, sufficient and

adequate for . . . [fulfillment of this contract].

The Supreme Court in *Kern-Limerick, supra* at 112, 74 S.Ct. at 405, expressly approved the use of different contractual language to avoid the imposition of State sales tax on a contractor. The contract in *Kern-Limerick* stated:

> The Contractor shall act as the purchasing agent of the Government in effecting such procurement and the Government shall be directly liable to the vendors for the purchase price.

The evidence shows that it has been the express purpose of the United States and its Department of Defense not to designate cost-plus contractors, such as Hercules, as purchasing agent, despite the state tax consequences. This decision by the United States must be to effectuate some other policy which it considers more important than the avoidance of state tax liability.

The Supreme Court has not relied solely on the language in the contract to establish the true contractual relationship between the United States and its contractor but has looked to see whether the course of business has been in accordance with the express terms of the contract. We find here that it has been so. None of the purchase order forms bound the credit of the United States. Only the credit of Hercules was pledged. It is irrelevant in determining who is the purchaser as between Hercules and the United States that the United States held title to the tangible personal property after delivery, that it bore the risk of loss before delivery, and that it exercised substantial control over procurement of the property under the contract.

Based on the above, we find that Hercules was the purchaser of all of the tangible personal property which gave rise to the Commonwealth's assessments of its Sales and Use taxes. We therefore conclude that the Virginia Sales and Use tax is constitutionally valid as applied here and that Hercules owes the tax.

The plaintiffs maintain that even if Hercules was the purchaser, the sales to Hercules were within the sales for resales exemption of the statute, Code of Va. § 58–441.2(c). We find that this exemption is inapplicable to Hercules.

This exemption is designed only to prevent multiple sales tax incidence for the same tangible personal property. The sales tax is designed to be legally incident only on the final consumer-purchaser. This exemption prevents the multiple imposition of the sales tax as goods are distributed by middlemen before they are finally sold at retail. We find that Hercules was the final consumer-purchaser of these items of tangible personal property.

Hercules or its employees consumed (or used) the office equipment and supplies, building and grounds equipment supplies, safety prizes, miscellaneous tools, automotive supplies and repair parts, coal used in comfort heating, safety apparel, magazines and hospital supplies. It is admitted that Hercules never had legal title to these items and that it was reimbursed fully by the United States for the cost of their purchase. However, they were purchased by Hercules for its consumption in the performance of its contract with the United States to manufacture military propellants and explosives. We cannot say that any of these items were "resold" to the United States.

For the reasons stated herein, it is

ORDERED that plaintiffs' motion for summary judgment is DENIED; that the defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED.