624 F.2d 111
 28 Cont.Cas.Fed. (CCH) 81,365
 UNITED STATES of America, Plaintiff-Appellee,
v.
STATE OF NEW MEXICO; Bureau of Revenue of the State of New
Mexico; and Fred L. O'Cheskey, as Commissioner of
Revenue of the State of New Mexico and
his successors in office,
Defendants-Appellants.
 No. 78-1755.
 United States Court of Appeals,
Tenth Circuit.
 June 2, 1980.
 
 Daniel H. Friedman, Sp. Asst. Atty. Gen., Santa Fe, N.M. (Jan E. Unna, Sp. Asst. Atty. Gen., and Jeff Bingaman, Atty. Gen. of N.M., Santa Fe, N.M., with him on the brief), for defendants-appellants.
 John J. McCarthy, Atty., Tax Division, Dept. of Justice, Washington, D.C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Jonathan S. Cohen, Attys., Tax Division, Dept. of Justice, Washington, D.C., R. E. Thompson, U.S. Atty., and Ruth C. Streeter, Asst. U.S. Atty., Albuquerque, N.M., of counsel, with him on the brief), for plaintiff-appellee.
 Before McWILLIAMS, BARRETT and McKAY, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 The United States seeks a declaratory judgment defining the status for purposes of the New Mexico Gross Receipts and Compensating Tax[1] of three private corporations under management contracts with the Energy Research and Development Administration (ERDA), the successor to the Atomic Energy Commission (AEC).[2] The government also seeks a declaration that, as a matter of constitutional law, it must be permitted to intervene in any New Mexico administrative proceeding involving the tax status of the three corporations.
 
 
 2
 The government's substantive arguments focus on whether the contractors are agents of the United States for certain functions.[3] As agents for the disbursement of federal funds, they would be constitutionally immune from application of the gross receipts tax to those funds.[4] See N.M.Stat.Ann. § 72-16A-12.1 (Supp.1975) (exemption for the government); N.M.Stat.Ann. § 72-16A-3F (Supp.1975) (requirement of receipt). In addition, if the contractors are procurement agents for the government, their suppliers of tangible personal property would be entitled to a tax deduction. See N.M.Stat.Ann. § 72-16A-14.9 (Supp.1975).
 
 
 3
 The parties filed cross-motions for summary judgment. Most facts, including the applicable contract language, were stipulated. The district court granted the motion of the United States, finding that the contractors were disbursement and procurement agents for the government and that the United States must be permitted to intervene in the state proceedings. The district court found that in paying their own operational costs such expenses as overhead and salaries the contractors were merely disbursing, not receiving, federal funds. The court also found that purchases of tangible personal property, even though used in the contractors' own work, were made as agents of the government.
 
 
 4
 We agree with the district court that the United States may intervene in state proceedings. However, we believe that the law which has developed to resolve agency questions in the government contract context requires that the district court grant summary judgment to New Mexico on the agency issues.
 
 
 5
 The three contracts involved here are in most respects standard AEC management contracts a genre of contracts developed to facilitate the AEC's heavy reliance on private industry in the construction and management of large research and development facilities. Although AEC management contracts closely resemble typical cost-plus government contracts, they also contain unusual features. For instance, they contemplate long-term relationships and vest substantial autonomy in the contractors. See Hiestand & Florsheim, The AEC Management Contract Concept, 29 Fed.B.J. 67, 68 (1969).
 
 
 6
 Under its contract, Sandia Corporation, a subsidiary of Western Electric Company, Inc., operates the Sandia Laboratories owned by ERDA. Sandia was created in 1949 to perform research and development for the AEC, and it is not involved in private work. It receives no fee or profit under its contract and owns no property except the $1,000 in United States bonds constituting its nominal paid-in capital.
 
 
 7
 The Zia Company, a subsidiary of Santa Fe Industries, Inc., has been performing a variety of functions in support of ERDA's Los Alamos Scientific Laboratory since 1946. Zia performs separate private work with a distinct set of records, employees and locations. Virtually none of Zia's private property is involved in performance of its contract with ERDA.
 
 
 8
 Los Alamos Constructors, Inc. (LACI) is a subsidiary of the Zia Company. It performs construction work in support of the Los Alamos Scientific Laboratory. LACI owns no tangible personal property and procures the property needed in performance of its Los Alamos contract through Zia.
 
 I.
 
 9
 The cornerstone case on whether a government contractor may share in the intergovernmental tax immunity enjoyed by the United States is Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941). There the Supreme Court upheld a sales tax levied on the purchases of cost-plus-fixed-fee contractors notwithstanding the fact that the government would ultimately pay the tax in reimbursing the contractors' costs. The Court rejected an economic impact test and decided the case on the basis of the bare legal incidence of the tax. "The asserted right of the one (sovereign) to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of (its contractors)." Id. at 9, 62 S.Ct. at 45. The incidence of the tax was found to fall on the contractor, not the government, even though, inter alia, the government maintained extensive control over the contractor, the title to the goods purchased subject to the tax passed directly to the government, and the government was to assume good faith obligations of the contractor upon termination of the contract.
 
 
 10
 In 1952 the Supreme Court interpreted § 9(b) of the Atomic Energy Act of 1946 to be a legislative extension of governmental immunity to AEC contractors. Carson v. Roane-Anderson Co., 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257 (1952). Congress promptly repealed § 9(b), Act of August 13, 1953, Pub.L. No. 83-262, 67 Stat. 575 (1953), for the express purpose of putting AEC contractors on the same footing as other government contractors, who, since the decision in King & Boozer, are rarely found to be immune from taxation. The Senate Report accompanying the repealer discloses a congressional sensitivity to the decreased tax bases of those states with large-scale AEC activities. S.Rep. No. 694, 83d Cong., 1st Sess., reprinted in (1953) U.S.Code Cong. & Admin.News, pp. 2379, 2380.
 
 
 11
 Since the decision in King & Boozer, the Supreme Court has only twice been satisfied that a sufficient relationship existed between the contractor and the government to qualify the contractor for implied constitutional immunity. In Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), the Court found a contractor to be an agent for the government for procurement and, therefore, immune from a sales tax. Language in the request for bids, the contract, and the purchase order clearly and uniformly disclosed an intention for the government to be directly obligated to the vendor for the contractor's purchases. Id. at 119-20, 74 S.Ct. at 409. In the course of the opinion, the Court also noted the careful attention Congress has given to the proper adjustment of intergovernmental tax burdens. Id. at 116, 74 S.Ct. at 407.
 
 
 12
 Justice Douglas, in his Kern-Limerick dissent, criticized the majority opinion insofar as it could be read to allow "any government functionary to draw the constitutional line by changing a few words in a contract." 347 U.S. at 126, 74 S.Ct. at 413 (Douglas, J., dissenting). This concern that immunity questions not turn on technicalities of contract drafting reappeared in the majority opinions of the Michigan property cases decided four years later:
 
 
 13
 Constitutional immunity from state taxation does not rest on such insubstantial formalities as whether the party using government property is formally designated a "lessee." Otherwise immunity could be conferred by a simple stroke of the draftman's pen.
 
 
 14
 United States v. Township of Muskegon, 355 U.S. 484, 486, 78 S.Ct. 483, 485, 2 L.Ed.2d 436 (1958) (emphasis added). The Michigan opinions recognize Congress as "the proper agency . . . to make the difficult policy decisions necessarily involved in determining whether and to what extent private parties who do business with the Government should be given immunity from state taxes." City of Detroit v. Murray Corp., 355 U.S. 489, 495, 78 S.Ct. 458, 462, 2 L.Ed.2d 441 (1958). See also United States v. City of Detroit, 355 U.S. 466, 474, 78 S.Ct. 474, 478, 2 L.Ed.2d 424 (1958). Cf. United States v. Boyd, 378 U.S. 39, 51, 84 S.Ct. 1518, 1525, 12 L.Ed.2d 713 (1964).
 
 
 15
 In 1960 the Supreme Court affirmed, without opinion or citation, a three-judge district court determination that an AEC contractor in South Carolina was a tax-exempt government agent. Livingston v. United States, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960) (per curiam), aff'g 179 F.Supp. 9 (E.D.S.C.1959). The district court relied heavily on the fact that this AEC contractor undertook government work as a contribution to the defense effort rather than as a source of profit. Although the contract involved in Livingston was typical of AEC management contracts in most respects, it provided for only a nominal one-dollar fee, and purchase orders were made on behalf of the government. 179 F.Supp. at 18. Later, in United States v. Boyd, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964), the Supreme Court, considering another AEC management contract, sharply limited Livingston to the " 'extraordinary' contractual relationship" involved and the "factual determination that (the contractor) received no benefits from the contract." Id. at 45 n. 6, 84 S.Ct. at 1522 n. 6.
 
 
 16
 In Boyd, the latest pertinent Supreme Court pronouncement, two AEC management contractors claimed exemption from a Tennessee use tax. After reviewing the contractual relationships involved, the Court affirmed the state supreme court determination that, despite extensive entanglement with the AEC, the incidence of the tax fell on the contractors' "private use" of government property for their "own profit and gain." Id. at 43, 84 S.Ct. at 1521. The Court rejected the government's argument that the contractors were agents with the observation that they were not "constituent parts" or "instrumentalities" of the government. Id. at 46-48, 84 S.Ct. at 1523-24. The opinion concluded by reserving to Congress the responsibility for readjustment if the Court's restricted interpretation of governmental immunity proves unworkable. Id. at 51, 84 S.Ct. at 1525.
 
 
 17
 Although there is language in these Supreme Court opinions suggesting that the results turn on traditional agency principles, see, e. g., United States v. Township of Muskegon, 355 U.S. at 486, 78 S.Ct. at 485, it seems evident that the Court is more concerned with preserving the delicate financial balance between our co-existing sovereignties than with rigid adherence to agency law terminology. The trend toward restricting tax immunities, see generally Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 633 (1945), reflects an awareness of the serious threat posed to state revenues by ballooning governmental dealings in the private sector. See Note, Federal Tax Immunity and the Legal Incidence of the Maine Sales Tax, 29 Maine L.Rev. 149, 153-54 (1977). The Court has repeatedly deferred to Congress in this area and Congress, openly sensitive to the impact on state treasuries, has not extended tax immunity to any class of contractors.
 
 
 18
 We, too, are mindful of the tension between the power of the federal government to insulate itself from state tax burdens and the limited tax bases of state and local units. Clearly, Congress may legislatively provide tax immunity to federal contractors. In addition, under Kern-Limerick a federal agency may bring a contractor within the scope of intergovernmental immunity if a decision to create an agency relationship is made in advance of a dispute and is unequivocably expressed in all relevant documents.[5] The state may not similarly protect its treasury.
 
 II.
 
 19
 With this concern for proper intergovernmental adjustments in mind, we have reviewed the assertions of each party. We dispose initially of the government's claim that the contractors do not receive, as required by the statute, see N.M.Stat.Ann. § 72-16A-3F (Supp.1975), the funds they disburse for their own salaries and overhead. As long as the contractors are separate entities solely responsible for their own employees and internal management, salaries and overhead cannot be the "obligations of another."[6] Cf. Westland Corp. v. Commissioner of Revenue, 83 N.M. 29, 487 P.2d 1099, 1104 (Ct.App.), cert. denied, 83 N.M. 22, 487 P.2d 1092 (1971). The contractors are paying their own obligations and, regardless of the funding device employed, they receive the funds when they exercise dominion over them by issuing drafts to their obligees. To the extent that third parties are involved, in the procurement of goods and services for instance, it is possible that the contractors do function in an agency capacity and should, therefore, be tax exempt.
 
 
 20
 The factors urged as indicative of agency status here are not new to government contract cases. The contracts discussed in United States v. Forst, 442 F.Supp. 920 (W.D.Va.1977), aff'd, 569 F.2d 811 (4th Cir. 1978), for example, contained several of the elements present here. Although the government conceded that the contractors in Forst were not agents, the court still analyzed the contractual characteristics necessary to make a contractor tax exempt. The court was unimpressed with the fact that all contract work was done at a government facility, 442 F.Supp. at 921, and that the government bore the risk of loss. Id. at 925. In addition, the court held that "it is not critical who holds title to the purchased items as between the United States and its contractor. Nor is the degree of control over the contractor . . . critical." Id. at 924. See also United States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958). In affirming Forst the Fourth Circuit agreed that "the key factor in the case was whether the credit of the United States or the contractor was bound by the purchasing agreements." 569 F.2d at 811.
 
 
 21
 The argument that the contracts with Sandia, Zia and LACI inherently create agent-principal relationships is also at odds with the contracts discussed in United States v. New Mexico, 581 F.2d 803 (10th Cir. 1978). The contracts there specially stated that the contractors were not agents but independent contractors. Ironically, those contracts were in most other respects very similar to the contracts we consider here. They provided, among other things, for the title of procured goods to pass directly to the government and for government approval of purchases over a stated amount. 581 F.2d at 804, 805.
 
 
 22
 An agency argument based on all the same factors present here was raised before the Supreme Court in Boyd.[7] See 378 U.S. at 46, 84 S.Ct. at 1523. The Boyd contractors, like Sandia, Zia and LACI, worked at a government facility with government property. They operated according to broad instructions from the AEC and obtained approval for purchases above a stated figure. Title to property procured by the contractors passed directly to the government, which also bore the risk of loss. They also used advanced funding. The Court, in dismissing the agency claim, applied what may be even more stringent standards than we apply here. It found that the contractors were not "so assimilated by the Government as to become one of its constituent parts," 378 U.S. at 47, 84 S.Ct. at 1523 (quoting United States v. Township of Muskegon, 355 U.S. at 486, 78 S.Ct. at 485), nor "so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity." 378 U.S. at 48, 84 S.Ct. at 1524. This instrumentality language parallels the Atomic Energy Act which defines "Government agency" to include only those independent establishments or corporations which are wholly or partly owned by the government and which are also instrumentalities. 42 U.S.C. § 2014(1). The government concedes that Sandia, Zia and LACI are not instrumentalities. Record App. at 345.
 
 
 23
 A number of other contractual features have been brought to our attention, but we find them either insubstantial or so common to government contracts generally that they have no particular bearing on the issue of agency. Characteristics common to virtually all AEC management contracts, even though not found in the contracts of other agencies, also have little impact on our determination. The repeal of § 9(b) of the Atomic Energy Act illustrates congressional aversion to the notion that AEC contractors as a group are more entitled to tax immunity than are other federal contractors. Our reiterated antipathy to wholesale deprivations of state treasuries without congressional action, requires, at the least, some special arrangement before tax immunity attaches.
 
 
 24
 The government places emphasis on the fact that Sandia, Zia and LACI receive "advanced funding" from the ERDA rather than reimbursement for expenses. The contractors pay their creditors and employees with drafts drawn on a special bank account in which United States Treasury funds are deposited, under the authority of a letter of credit, to cover withdrawals.[8] While the Court in Boyd was no more impressed with the advanced funding aspect of the contracts it reviewed than with any other features, we find it worthy of discussion. On the surface advanced funding does appear to give the contractor the power to pledge the credit of the government a significant indicator of agency status. See Alabama v. King & Boozer, 314 U.S. at 13-14, 62 S.Ct. at 47; United States v. Forst, 442 F.Supp. 920, 925 (W.D.Va.1977), aff'd, 569 F.2d 811, 811 (4th Cir. 1978).
 
 
 25
 Despite appearances, however, advanced funding does not vest in the contractor the power to create obligations of the government as an agent.[9] At most, the contractor may pledge to the limits of its letter of credit. Seen in this light, Sandia, Zia and LACI are like numerous businesses which deal under letters of credit from banks and other sureties. In fact, the federal government finances many organizations through letters of credit and advanced funding for which no claim of agency relationship could seriously be made. See, e. g., Record App. at 237-42. Federal regulations allow letters of credit to be issued to "any State and local government educational institution, international organization and any other public and private organization." 31 C.F.R. § 205.3(a). Like guarantees, advanced payment from customers does not transform independent contractors into agents.
 
 
 26
 Advanced funding is simply another means of reimbursement devised by accountants to eliminate major weaknesses in the government's bookkeeping practices:
 
 
 27
 (Government agencies') general practice when operating through private contractors on a reimbursable-cost basis, has been to record the initial sums paid such contractors as advances and to reflect costs in the Government's accounts only when contractors' expenditures have been audited and reimbursed by the Government. This practice has two basic weaknesses in the accounting . . .:
 
 
 28
 (1) A considerable lag in time exists between the dates when the contractor incurs costs and when the Government accounts record the expenditures.
 
 
 29
 (2) It is extremely difficult for the Government to break down the records of these expenditures so as to obtain a useful cost analysis . . . .
 
 
 30
 Fifth Semiannual Report of the Atomic Energy Commission 132 (1949), Record App. at 376. Advanced funding also encourages companies to undertake government contracts for little or no fee because it insulates contractors from the costs and risks of borrowing funds to meet contract obligations. Record App. at 208. Official documents make no distinction, other than for accounting purposes, between contractors which do or do not use advanced funding, see Ninth Semiannual Report of the Atomic Energy Commission 57-59 (1951), Record App. at 331-33, and we do not believe any distinction is warranted. As a matter of law, federal contractors are not transformed into tax-exempt agents by a federal agency's decision to change accounting practices or to simplify methods of payment.[10]
 
 
 31
 One of the contracts in this case requires particular consideration in light of United States v. Livingston, 179 F.Supp. 9 (E.D.S.C.1959), aff'd, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). Sandia receives no fee for the performance of its contract with the government.[11] In Livingston a federal contractor was found to be a tax-exempt procurement agent because, among other things, its contract provided for only a one-dollar fee and was undertaken out of a "high sense of public responsibility" and "without hope of gain." 179 F.Supp. at 23, 18. Although we have doubts that such a factual determination would today withstand appellate review,[12] we recognize the theoretical possibility that a "genuine issue of material fact" might be created on this question. Nevertheless, we do not believe that this potential factual issue requires remand for a trial. The Supreme Court has limited Livingston not only to its peculiar "factual determination," but also to the " 'extraordinary' contractual relationship" exhibited there. United States v. Boyd, 378 U.S. at 45 n.6, 84 S.Ct. at 1522. As we have indicated, the contracts here in issue are not extraordinary.
 
 
 32
 As with advanced funding, decisions on the amount of fee, if any, to be paid a government contractor are not made primarily with agency consequences in mind. The regulations provide for fee negotiations with each contractor, taking into account such factors as tax posture. See ERDA-PR Temporary Reg. No. 17, April 2, 1976, Record App. at 390-94. Without more, we decline to hang agency status, and thereby the welfare of state treasuries, on the existence or amount of a fee.
 
 
 33
 There is one final aspect of the contracts with Sandia, Zia and LACI which demands our attention. During the course of this litigation, the local AEC contracting officers in New Mexico modified these three contracts to refer directly to the contractors as agents, apparently in an attempt to fall within the shelter of Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), and to avoid New Mexico's argument that the omission of agency terminology was intentional. By their terms, however, the amendments add nothing substantive to the contracts. To be sure, they state that the "contractor acts as an agent for and on behalf of ERDA for certain purposes." But they conclude with the caveat:
 
 
 34
 The purpose of this article is to recognize and express existing relationships. This article shall not be construed to modify any other provisions of the contract . . . nor shall it create rights or obligations not otherwise provided for in the contract.
 
 
 35
 Zia Contract, Mod. No. MO69, Record App. at 174. See also Sandia Contract, Mod. No. 30, Record App. at 169; LACI Contract, Mod. No. MO59, Record App. at 179. Because we are convinced that, as a matter of law, the provisions of the contracts before the amendments did not establish agency status, we need not be swayed by amendments which make no changes.
 
 
 36
 It is also significant that the agency terminology does not appear uniformly in all the documents relating to the contracts. The "Standard Terms & Conditions for fixed price purchase orders" clearly distinguish between the "Buyer" Sandia, Zia or LACI and the "Government." Record App. at 246-47. Sandia's contract requires it to make purchase orders and subcontracts in its own name. Sandia Contract, Mod. No. 29, Art. XI, § 2, Record App. at 145.
 
 
 37
 We are highly skeptical of the sporadic addition of "magic words" to a contract in an attempt to avoid state taxation. The importance of proper intergovernmental tax adjustments obligates us to require much more when the power to create agents is being exercised by the executive branch. While Congress may confer tax immunity in a word, an executive agency must clearly manifest the principal-agent relationship with all its ramifications if state taxation is to be precluded. There is not a clear manifestation here.
 
 III.
 
 38
 On the final issue the district court determined that "the United States is the real party in interest and should be recognized as a party in any New Mexico administrative tax proceeding involving the three contractors involved herein or their vendors." Record App. at 34. Our decision on the agency issues removes the rationale of the district court's determination. However, we are unwilling to conclude that the United States may properly be excluded, under all circumstances, from state tax proceedings involving these contractors.
 
 
 39
 Determination of the "real party in interest," as a matter of procedural fairness, should not be made in the absence of any possibly relevant party. The United States must be permitted to intervene in the administrative proceedings to advocate on the facts its status as the real taxpayer. In fact, New Mexico courts and the Bureau of Revenue have permitted United States participation when "the contracts with Zia and LACI obligate the United States to provide funds necessary to defray all costs incurred in the performance of the contracts, including taxes." United States v. Bureau of Revenue, 87 N.M. 164, 531 P.2d 212, 213 (Ct.App.1975). Participation is important in creating the full record necessary for appellate review should the Bureau deny the government's taxpayer claim. Finally, New Mexico provides us with no examples of prejudice that would result from United States participation. Cf. County of San Bernardino v. Harsh California Corp., 52 Cal.2d 341, 340 P.2d 617, 621 (1959). Indeed, the State admits its willingness to permit de facto government participation through representation of the contractors by the United States Attorney's office. Brief for Appellant at 60-61. Full participation by the United States would thus protect the United States without damaging any real interest of the state.
 
 IV.
 
 40
 The district court should enter summary judgment in favor of New Mexico on the agency issues and the United States on the administrative proceeding issue:
 
 
 41
 1. Sales of tangible personal property to the ERDA, through its management contractors Sandia and Zia, are subject to the New Mexico gross receipts tax.
 
 
 42
 2. Advanced funds used for government operations under ERDA management contracts with Sandia, Zia and LACI are subject to the New Mexico gross receipts tax.
 
 
 43
 3. The United States has the right to participate in administrative tax proceedings wherein tax liabilities of Sandia, Zia and LACI are at issue.
 
 
 
 [1]
 When this suit was instituted, the tax was codified at N.M.Stat.Ann. §§ 72-16A-1 through 72-16A-19 (Supp.1975). The tax has since been amended and now constitutes N.M.Stat.Ann. §§ 7-9-1 through 7-9-81 (1978). Citations in this opinion conform to the earlier enumeration. We refer only to the gross receipts tax because a determination of liability or exemption under the gross receipts tax will apply as well to the compensating tax. See Western Elec. Co. v. New Mexico Bureau of Revenue, 90 N.M. 164, 169, 561 P.2d 26, 29 (1976)
 
 
 [2]
 Initially, research and development for nuclear weapons was the responsibility of the Army Corps of Engineers. Responsibility was subsequently transferred to the AEC (January 1, 1947), the ERDA (January 19, 1975), and finally the Department of Energy (October 1, 1977). See Department of Energy Organization Act, 42 U.S.C. §§ 7101 et seq
 
 
 [3]
 Other potential issues were resolved by a companion case in this court and a prior action between these parties in a state court. In United States v. New Mexico, 581 F.2d 803 (10th Cir. 1978), we determined the incidence of the gross receipts tax. In United States v. Bureau of Revenue, 87 N.M. 164, 531 P.2d 212 (Ct.App.1975), the New Mexico Court of Appeals held that the state was estopped from collecting assessments from two of the contractors for the period January 1, 1966, to June 30, 1967. The Bureau of Revenue had previously considered the contractors to be agents and had not given notice of its change of position. Lack of sufficient notice is not an obstacle to this suit. We note also that the Bureau's prior understanding of agency law in no way requires that a federal court find an agency relationship to exist now. For purposes of intergovernmental immunity, the applicable agency law is necessarily federal. New Mexico quite properly could change its own definitions of agency so long as its new definition did not impinge on the area of immunity mandated by the Constitution
 
 
 [4]
 Although Congress could immunize these contractors from state taxation, it has not done so directly and congressional immunity will not be implied. See Oklahoma Tax Comm'n v. Texas Co., 336 U.S. 342, 365-66, 69 S.Ct. 561, 573-74, 93 L.Ed. 721 (1949). The contractors may nonetheless make a claim to constitutional immunity if their connection to the government is so close that a tax on them is in reality on the government. See Alabama v. King & Boozer, 314 U.S. 1, 13, 62 S.Ct. 43, 47, 86 L.Ed. 3 (1941); McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819)
 
 
 [5]
 It has been argued that tax immunity may be conferred only by the legislative branch. See L. Tribe, American Constitutional Law 399-401 (1978). This deference to Congress is amply supported by language in leading cases. See, e. g., United States v. Boyd, 378 U.S. 39, 51, 84 S.Ct. 1518, 1525, 12 L.Ed.2d 713 (1964); City of Detroit v. Murray Corp., 355 U.S. 489, 495, 78 S.Ct. 458, 461, 2 L.Ed.2d 441 (1958). We agree that Congress is best able to adjust tax burdens, but we cannot ignore the power given to executive agencies to create relationships through contract. Although we are skeptical of cosmetic provisions drafted by government functionaries, we must find immunity when these contracts inherently and inexorably draw a private corporation so close to the government as to make it a servant. See United States v. Forst, 442 F.Supp. 920, 924-25 (W.D.Va.1977), aff'd, 569 F.2d 811 (4th Cir. 1978)
 
 
 [6]
 There is no deduction for expenses incurred in performing the service. See N.M.Stat.Ann. § 72-16A-3K (Supp.1975). Cf. City of Los Angeles v. Clinton Merchandising Corp., 58 Cal.2d 675, 25 Cal.Rptr. 859, 863, 375 P.2d 851, 855 (1962). The statute is measured on gross rather than net proceeds; it taxes the privilege of conducting business in New Mexico, whether profitable or not. See N.M.Stat.Ann. § 72-16A-2 (Supp.1975). The failure of the legislature to reenact the predecessor statute's specific language prohibiting deduction for losses or expenses, see N.M.Stat.Ann. § 72-16-2D (1953) (Emergency School Tax Act), does not alter the obvious meaning of the statute
 The government insists that Sandia, Zia and LACI are meeting the obligations of the government in paying salaries and fringe benefits, but that contractor employees have no claim against the government for labor-related grievances. See Record App. at 342. In other words, employees may not bargain with the government for the salaries and benefits supposedly flowing directly from the government. Acknowledging that tort liability depends on the "overall relationship between the United States and the contractor and on the control inherent in that relationship," Brief for Appellee at 48, the government nonetheless denies any tort responsibility for contractor negligence. Record App. at 342. As admitted, Sandia, Zia and LACI are not agents for the purpose of "directing the details of day-to-day research or maintenance operations and the hiring and direct supervision of employees," Record App. at 33, but apparently only for the purpose of avoiding state taxation.
 
 
 [7]
 The government challenges the applicability of Boyd. Concededly, Boyd does not decide the precise issue here but it provides us with an analogous situation in which similar considerations were weighed. In the Tennessee Supreme Court, Boyd focused on two questions: the imposition of state sales tax on the contractors' purchases and the imposition of a use tax on the contractors' use of AEC-owned property. United States v. Boyd, 211 Tenn. 139, 363 S.W.2d 193 (1962). The Tennessee court first found that the contractors were agents in purchasing for the AEC and therefore immune. On the second question the court concluded that, because the contractors used the property for their own benefit, the use tax was valid. Only the second finding was appealed. The United States Supreme Court noted specifically that it was not presented with the first issue and that "the validity of the contractor's use tax, as against a constitutional claim of immunity, in no way depends on the legality of the sales tax." United States v. Boyd, 378 U.S. 39, 43 n.5, 84 S.Ct. 1518, 1521, 12 L.Ed.2d 713 (1964). We read this footnote neither as an approval of the state court's treatment of the issue not appealed, nor as a limit on the application of the Court's opinion to cases resembling the first issue. The Court merely noted that the two aspects of the taxing statute could be independently considered
 Because an agency issue was raised in Boyd, the applicability of the case turns on whether the taxed activity in Boyd is entirely distinguishable from the activities Sandia, Zia and LACI allegedly perform as agents. We think not. Using government property in the course of performing a government contract is not unlike incurring obligations to achieve the same end. If advanced funding is, as we believe, another form of reimbursement, the government has no different interest in a cost-type contractor's process of incurring and paying obligations than in any other function necessary to reach the desired result. Unless contract provisions provide otherwise, the government's interest dominates only in the result sought to be obtained by contract here, research and development. See note 13, infra.
 
 
 [8]
 The steps involved in advanced funding are: (1) The contractor, the United States, and a designated bank open a special bank account pursuant to a three-party contract. The United States owns any balance in the account, but the contractor is given the right to execute drafts payable to third parties in order to satisfy any expenses incurred in performing the underlying government contract, see Record App. at 206-07, 209-18; (2) ERDA issues a letter of credit to an appropriate Federal Reserve Bank in favor of the contractor; this letter of credit provides the general authority for this Federal Reserve Bank to make United States Treasury funds available for deposit in the special bank account, see Record App. at 206-07, 220-21, 223, 224; (3) when a contractor incurs a contract expense, the contractor pays the expense by executing a draft payable to the creditor and drawn on the special bank account, see Record App. at 206-07; (4) at the time the contractor executes a draft on the special bank account, the contractor or the bank executes a payment voucher in an amount sufficient to cover the draft. This voucher is forwarded to the appropriate Federal Reserve Bank. The Federal Reserve Bank in turn deposits an equivalent sum to the account of the designated bank of deposit, and the designated bank of deposit credits the special bank account with funds sufficient to cover the draft. See Record App. at 205-08, 219-22
 
 
 [9]
 The government asserts that it considers obligations properly incurred by Sandia, Zia and LACI to be obligations of ERDA. See Brief for Appellee at 35; Record App. at 207, 168, 173-74, 179, 338, 383. It is clear from the record, however, that this assertion is founded on the government's view of the ramifications of advanced funding and the fact that ERDA would not deny a valid claim arising from contract performance in the absence of sufficient advanced funds. See Record App. at 369-71. We are not bound by the government's assertion of direct liability because we believe advanced funding to be just another form of reimbursement, and ERDA responsibility for properly incurred claims to be inherent in all cost-type contracts. See 32 C.F.R. § 7-402.2 (1976). The decision that cost reimbursement would not make government contractors into agents has been made for us. See Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941)
 
 
 [10]
 The AEC had 43 contractors on advanced funding as of 1973. Ten were in New Mexico and 34 were private corporations. AEC Manual, Appendix 1101, Part III, § A at 5-6 (March 1973); Record App. at 388. As of 1977, 165 ERDA contractors had letters of credit and more than 8,000 are currently being issued to contractors by other federal agencies under general statutes and regulations authorizing advanced funding. See Record, vol. 6, at 9 (McGrath depo.); 41 U.S.C. § 255(a)(1); 41 C.F.R. §§ 1-30.400 et seq. (1979); 31 C.F.R. § 205.1-10 (1979)
 
 
 [11]
 Zia and LACI receive fixed fees annually for work performed under their contracts with ERDA. Gross receipts taxes are paid on their fees. Record App. at 27. This challenge is limited to the funds used to pay their employees, suppliers and overhead
 
 
 [12]
 There are business advantages for ERDA contractors more valuable than a fee, for example, the acquisition of invaluable technical and engineering information and experience and the possibility of acquiring valuable patents as an outgrowth of research and development activities conducted at federal expense. Newman, The Atomic Energy Industry: An Experiment in Hybridization, 60 Yale L.J. 1263, 1320-21 (1951). And while obtaining these benefits, Sandia is protected from usual business risks by advanced funding. Moreover, Sandia's profit-conscious parent, Western Electric, and its affiliates, e. g., American Telephone & Telegraph Company, receive many benefits from Sandia's performance of the ERDA contract. They reserve nonexclusive, irrevocable, royalty-free licenses under any communication-related patents taken on discoveries made by Sandia. See Sandia Contract, Mod. No. 29, Art. IX, § 1, Record App. at 142-43. The government pays Sandia's overhead and the salaries of parent-company employees who may be used or trained in the course of Sandia's operations. See Sandia Contract, Mod. No. 29, App. A, Art. III, § 1, Record App. at 151. Through Sandia's contract, Western Electric and Bell Telephone Laboratories, Inc., are also paid for furnishing auditing services, research and development, products, and supervisory services. See Sandia Contract, Mod. No. 29, App. A, Art. III, § 2-5, Record App. at 152-53