UNITED STATES of America

v.

DISTRICT OF COLUMBIA, Appellant.

No. 80–1457.

United States Court of Appeals, District of Columbia Circuit.

Argued May 27, 1981.

Decided Nov. 17, 1981.

Richard G. Amato, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Richard L. Aguglia, Asst. Corp. Counsel, Washington, D. C., were on brief for appellant. Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., also entered an appearance for appellant.

Donald B. Susswein, Atty., Dept. of Justice, Appellate Division, of the N. Y. Bar, with whom John F. Murray, Acting Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Michael L. Paup and Ann Belanger Durney, Attys., Dept. of Justice, Washington, D. C., were on brief for appellee.

Before BAZELON, Senior Circuit Judge, and MacKINNON and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring in part and dissenting in part filed by Circuit Judge MacKINNON.

GINSBURG, Circuit Judge:

This sales tax controversy stems from a conference sponsored by the United States Department of Commerce held in early 1978 at the Sheraton Park Hotel in Washington, D.C. Courtesy Associates, Inc. (Courtesy), pursuant to a cost-plus-fixed-fee contract with the Department of Commerce, provided management and logistic services for the conference. Courtesy paid the amount billed by the Sheraton Park for space and food, including D.C. sales tax, after the hotel's charges had been approved by the Commerce Department's contracting officer. In this action, the United States seeks restitution from the District of Columbia for the amount of the sales tax paid by Courtesy and reimbursed, pursuant to the cost-plus-fixed-fee contract, by the United States. Precedent securely indicates that any municipality other than the District of Columbia could tax sales of this sort. *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 482 (1941); *United States v. Forst*, 442 F.Supp. 920 (W.D.Va.1977), aff'd, 569 F.2d 811 (4th Cir. 1978). We conclude that Congress did not intend to place the District of Columbia on a footing different from other cities in this regard, and therefore hold that the United States is not entitled to the restitution it seeks.

I.

In the summer of 1977, the Department of Commerce began preparations for a five-day White House Conference on Balanced National Growth and Economic Development, to be held in Washington, D.C., January 29–February 2, 1978. Jerry Manolatos, Assistant Director for Conference Operations, selected the Sheraton Park Hotel as the Conference site after conferring with representatives of several hotels in the area. On August 2, 1977, on informal advice that the Sheraton Park had been selected, the hotel's representative wrote Manolatos:

Jerry, I understand that you will be working on a contract which will be ready within the next two months, however, for our records, if you would please sign and return the copy of my letter of agreement to you, we will be able to consider this a definite committment [sic].

Appendix (A)74. The record does not indicate that Manolatos ever signed the agreement proffered by the Sheraton Park. It does show that in a reply letter dated Au-

gust 11, 1977, Manolatos confirmed his "understanding of the agreement reached to date," and stated that he was

> currently working with our Procurement Division to develop a contract for Conference management and logistics, which will incorporate the items specified in your correspondence to us, the accommodations and meal costs, services to be provided by the hotel, and other items to be clarified within the next few weeks.

A75. Manolatos and Sheraton Park personnel had further conversations during the summer concerning accommodations and meals the hotel would provide for the Conference. It bears emphasis, however, that the United States has never asserted Manolatos had authority to bind the Government to an agreement of any kind.

On September 30, 1977, the Department of Commerce entered into a contract with Courtesy Associates. In return for reimbursement of its costs plus a fixed fee, Courtesy would provide management and logistic services for the Conference. The contract, which specifically named the Sheraton Park Hotel as the Conference site, ¶ IV.A.3, A81, made Courtesy responsible for "all negotiations and coordination re: meals; purchasing procedures for observers; sleeping accommodations, [and] coordination of function rooms and workshops." ¶ IV.D.l.e, A85. After the Conference, upon approval of the Commerce Department, Courtesy was to pay the hotel bill; the Department would then reimburse Courtesy. ¶ IV.D.3.a., A91.

Upon entering into the contract, Courtesy assumed all responsibility for Conference goods, services, and facilities arrangements,

"including the negotiating and firming up of prices and quantities of space and food" at the Sheraton Park. Tyler aff. ¶ 5, A69. On January 3, 1978, Courtesy sent the Sheraton Park a proposed agreement outlining arrangements for the procurement of space and food; an agent of the hotel signed a copy of the agreement and returned it to Courtesy. Stampfli aff. ¶ 6, A58. The Conference proceeded as planned; the Sheraton Park billed Courtesy for the space and food, including in the bill the D.C. sales tax; Courtesy and the Department of Commerce approved the bill; and Courtesy paid it, with no protest about the sales tax.

The United States thereafter commenced this action seeking to recover the amount of $8,199.95, the total sales tax billed by the Sheraton Park, paid by Courtesy without protest, and reimbursed by the United States. The complaint asserted three bases for the claim that the procurement at issue is not subject to taxation by the District of Columbia: first, the space and food supplied by the Sheraton Park were sales to the United States, exempt from tax under D.C.Code § 47–2605; second, the procurement at issue is "constitutionally immune" from D.C. taxation because the "legal incidence" of the tax is upon the United States;[1] third, Courtesy's procurement of hotel space and food was a sale for resale to the United States.[2]

The District of Columbia unsuccessfully moved to dismiss the complaint on the ground that the D.C.Superior Court has exclusive jurisdiction to adjudicate D.C. tax controversies. The United States then sought and was granted summary judgment on the merits of its claim. In a brief order, the district court ruled that, in deal-

---

[1] Even if the "legal incidence" of the tax fell on the United States, constitutionally grounded federal tax immunity from state taxation would not bar the tax in question. The D.C. sales tax was enacted by Congress, not by a state. The United States abandoned this argument at an early stage of the litigation.

[2] In the district court, the United States pressed this argument vigorously and cited D.C.Code § 47–2601.14(a) in support of its contention. A126–29. The United States has not renewed the "sale for resale" argument on ap-

peal, perhaps in recognition of D.C.Code § 47–2607, which provides that in the absence of a valid certificate of resale, receipts from a sale shall be deemed taxable. The record reflects no resale certificate. Moreover, as the District of Columbia pointed out in the district court, Courtesy "was not a middleman in the wholesale-retail chain," A136, thus a "sale for resale" exemption does not appear to accommodate the procurement at issue. *See United States v. Forst*, 442 F.Supp. 920, 925 (W.D.Va.1977), aff'd, 569 F.2d 811 (4th Cir. 1978).

ing with the Sheraton Park, Courtesy served as an agent of the United States, and that the hotel space and food procurement was essentially a "direct purchase" by the United States. Citing federal tax immunity decisions,[3] the district court declared the sales tax erroneously assessed against Courtesy and entered judgment for the United States in the amount demanded in the complaint. The District of Columbia appeals, urging that the district court (1) lacked subject matter jurisdiction, and (2) erred in determining that the procurement was not subject to the D.C. sales tax.

## II.

The United States invoked jurisdiction pursuant to 28 U.S.C. § 1345, which provides generally for access to a federal forum in cases in which the United States is plaintiff:

> Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States ....

The District of Columbia, relying on D.C. Code § 11–1202, contends that Congress has vested exclusive authority to entertain challenges to D.C. taxation in the D.C. Superior Court, and has abolished all common-law remedies with respect to such taxation. D.C.Code § 11–1202 reads in pertinent part:

> Notwithstanding any other provision of law, the jurisdiction of the Tax Division of the Superior Court to review the validity and amount of all assessments of tax

made by the District of Columbia is exclusive. Effective on and after the effective date of the District of Columbia Court Reorganization Act of 1970, any common-law remedy with respect to assessment of tax in the District of Columbia and any equitable action to enjoin such assessments available in a court other than the former District of Columbia Tax Court is abolished.

█ It is undisputed that if the tax in question had been collected by any state or municipality in the nation other than the District of Columbia, 28 U.S.C. § 1345 would secure original jurisdiction in a federal district court. *E.g., United States v. Tax Commission*, 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975). The argument that Congress intended to establish a different rule for the District of Columbia is implausible.[4] While Congress may displace section 1345 in particular categories of cases if it so desires, courts will not infer such displacement unless Congress has made its intention plain. *See United States v. Kloman*, 176 F.2d 27, 28 (D.C.Cir.1949) (quoting *United States v. UMW*, 330 U.S. 258, 272, 67 S.Ct. 677, 685, 91 L.Ed. 884 (1947)); *United States v. Livingston*, 179 F.Supp. 9, 12 (E.D.S.C.1959) (three-judge court), *aff'd per curiam*, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960).

No clear indication of a congressional design to exclude this case from the district court's adjudicatory authority is discernible.[5] Indeed, as the United States points

---

**3.** *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 482 (1941); *United States v. Livingston*, 179 F.Supp. 9 (E.D.S.C.1959) (three-judge court), *aff'd per curiam*, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960).

**4.** The District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No.91–358, 84 Stat. 473, was intended to create a local court system similar in major respects to court systems in the several states. *See* S.Rep.No. 405, 91st Cong., 1st Sess. 5 (1969).

**5.** The United States cites 28 U.S.C. § 1364 in support of its argument that D.C.Code § 11–1202 does not qualify as an "Act of Congress" within the meaning of the "except" clause of 28 U.S.C. § 1345. Section 1364 provides: "For

the purposes of this chapter, references to laws of the United States or Acts of Congress do not include laws applicable exclusively to the District of Columbia." The United States presses this argument too far in contending that § 1364 was enacted specifically "to ensure that the jurisdiction of the United States District Courts provided for in [28 U.S.C. §§ 1330–1364] would not be affected by the jurisdiction provisions of the Court Reform Act." Brief for the Appellee at 11. In fact, as the United States later concedes, *id.* at 12 n.1, the apparent dominant purpose of § 1364 was to assure that federal question jurisdiction under 28 U.S.C. § 1331 would not encompass questions arising under substantive laws applicable solely to the District of Columbia.

out and the District of Columbia does not counter, there may be no provision in the D.C.Code embracing the claim asserted here. *See* D.C.Code §§ 47–2617, –2618 (identifying persons who may seek tax refunds and appeal adverse administrative determinations).[6] The District of Columbia, acknowledging that the United States might have no recourse to any forum unless it can bring an action under section 1345, suggests that the Government could protect its rights "by means of appropriate contract provisions," or by "getting its contractors to challenge [the tax]." Reply Brief at 4. It is not probable that Congress would deliberately place such hurdles in the way of the challenge the Government seeks to present. *Cf. City of New Orleans v. United States*, 371 F.2d 21, 28 (5th Cir.), *cert. denied*, 387 U.S. 944, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967).[7]

■ In short, the threshold question raised by the District of Columbia has only one answer compatible with this court's precedent and sensible analysis: this is a civil action commenced by the United States for which Congress did not "otherwise provide"; it is therefore an action within the subject matter jurisdiction of the district court as conferred by 28 U.S.C. § 1345.

### III.

In entering judgment for the United States, the district court ruled that Courtesy was an "agent" of the United States and that the procurement of accommodations and meals "was essentially a direct purchase by the United States." Apparently analogizing exemption for sales to the United States under the D.C.Code to the Federal

Government's immunity from state and local taxation under the Constitution, the district court cited two decisions dealing with federal tax immunity as it bears on transactions involving federal contractors: *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 482 (1941), and *United States v. Livingston*, 179 F.Supp. 9 (E.D.S. C.1959) (three-judge court), *aff'd per curiam*, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). Before turning directly to the D.C. sales tax, therefore, we treat the question whether the Federal Government's constitutionally based tax immunity would shield the procurement at issue were the taxing jurisdiction a state or a municipality other than the federal city.

■ The Federal Government's constitutionally based immunity, derived from the supremacy clause, *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), once generated "a bewilderingly complex array of judicial decisions." L. Tribe, American Constitutional Law 394 (1978). Current doctrine, however, establishes a rule of "legal incidence." Absent congressional consent, a state is barred by the supremacy clause from imposing a tax if the legal incidence of the levy is on the United States, but the Constitution presents no barrier if the legal incidence falls elsewhere:

The Constitution immunizes the United States and its property from taxation by the States, *M'Culloch v. Maryland*, 4 Wheat. 316 [4 L.Ed. 579] but it does not forbid a tax whose legal incidence is upon a contractor doing business with the United States, *even though the economic burden of the tax, by contract or otherwise, is ultimately borne by the United States.*

---

**6.** The District asserts no authority to obligate the United States or to compel collection from it.

**7.** The District relies principally on *Herian v. United States*, 363 F.Supp. 287 (D.D.C.1973). *Herian* was an ejectment action brought by the United States in the D.C. Superior Court and removed by the defendant to the United States District Court. Granting the motion of the United States to remand, the district court relied on D.C.Code § 45–910, which provides that

"the landlord may bring an action of ejectment to recover possession in the Superior Court of the District of Columbia." *Herian* appears to depart from *United States v. Kloman*, 176 F.2d 27 (D.C.Cir.1949) (§ 1345 is not displaced unless Congress explicitly so directs). Moreover, *Herian* did not present, as this case does, the prospect that no forum may be available to the Government if the district court lacks authority to hear the controversy.

*United States v. Boyd*, 378 U.S. 39, 44, 84 S.Ct. 1518, 1521, 12 L.Ed.2d 713 (1964) (emphasis added). *See generally* L. Tribe, *supra*, at 394–404; Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism*, 89 Harv.L. Rev. 682, 704–13 (1976) (although the Court's doctrine may appear wooden, it appropriately safeguards Congress' mediating role in deciding, free from state or federal executive intrusion, when to confer and when to deny immunity).

Resort to an "economic burden" test, barring a tax levy if the charge is ultimately passed through to the United States, was firmly rejected in *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 482 (1941). That pathmarking decision sustained state taxation of federal contractors' purchases of lumber to be used in construction of an army camp. The terms of the federal contract required the cost of the tax to be passed on to the United States. Despite the conceded immediate economic burden to the Government, the Court ruled that the only factor of constitutional significance is the legal incidence of the tax.

Alabama law, like District of Columbia law, made the seller collector of the tax, but the obligation to pay fell on the purchaser. "The precise question" in *King & Boozer*, therefore, was "whether the Government *became obligated to pay for the lumber* and so was the purchaser whom the [Alabama] statute taxes, but for the claimed immunity." 314 U.S. at 10, 62 S.Ct. at 46 (emphasis added). Notwithstanding the substantial control the Federal Government exercised over the contractors in *King & Boozer*, the Court determined that the United States was not the "purchaser" of the lumber within the meaning of the Alabama tax statute. The Government's control of the contractors did not arm the contractors with any authority to pledge the credit of the United States. The contractors, not the Federal Government, were bound to pay the purchase price to the vendor. *Id.* at 12, 62 S.Ct. at 46.

Language in *King & Boozer* suggested that a different result might obtain in cases where the contractor is authorized to pledge the credit of the United States. *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), presented just such a situation. The Court held impermissible an Arkansas sales tax levied on purchases by a federal contractor where the Government's contract (1) specifically identified the contractor as the "purchasing agent" of the United States *and* (2) made the Government directly liable to the seller. The "significant difference" between *Kern-Limerick* and *King & Boozer*, according to the Court, was not any distinction in the economic impact of the Alabama and Arkansas taxes, nor in the degree of discretion the contractors had in selecting suppliers. Rather, it was the express stipulation absent in the *King & Boozer* federal contract and present in the *Kern-Limerick* contract: "This purchase is made by the Government. The Government shall be obligated to the Vendor for the purchase price . . . ." 347 U.S. at 119, 74 S.Ct. at 409. The contract's explicit identification of "the Government" as the purchaser, the Court concluded, could not be avoided by Arkansas' attempt to designate the contractor as the purchaser. Under the contract, the United States was the disclosed sole purchaser. *Id.* at 121, 74 S.Ct. at 410. Hence, the legal incidence of the tax fell on the Government, not on the contractor, and federal tax immunity sheltered the transaction from any state levy. *See id.* at 120–21, 74 S.Ct. at 409–10.

■ *United States v. Forst*, 442 F.Supp. 920, 924 (W.D.Va.1977), *aff'd*, 569 F.2d 811 (4th Cir. 1978), cogently synthesizes the dispositions in *King & Boozer* and *Kern-Limerick*:

These two cases make it clear that it is not critical who holds title to the purchased items as between the United States and its contractor. Nor is the degree of control over the contractor that the United States exercises with respect to the purchases critical. *The key factor is whose credit, between the United States and the contractor, is bound by the purchasing agreement with the seller.*

(Emphasis added.) In sum, absent a federal contract specifically designating the contractor as an agent authorized to pledge the Government's credit or explicitly rendering the Government directly liable to the seller, state sales taxes, exacted from federal government contractors, encounter no Court-directed federal immunity shoal.[8] Congress, of course, may confer such immunity. *See United States v. New Mexico,* 624 F.2d 111, 116, 121 (10th Cir. 1980), *cert. granted,* 450 U.S. 909, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981). But in view of the potential impact on the revenue bases of the states, the judgment should be made by the national legislature, the branch best equipped by its structure and constituency to accommodate the respective interests of the states and the nation. The determination, "intrinsically political" as it is, should not be left to judicial resolution based on shades of differences in particular federal contracts, and even less to government contracting officers dominantly concerned with federal expenditures and not with preservation of state tax revenues against shrinkage. *See* Tribe, *supra,* 89 Harv.L.Rev. at 711 & nn.135–37.

▪ As the foregoing description of current precedent demonstrates, federal, constitutionally based tax immunity would not bar the levy of a sales tax on procurements of the sort at issue here were the tax imposed by a state. The legal incidence of the District of Columbia sales tax is on the purchaser.[9] Under *King & Boozer* and *Kern-Limerick,* a cost-plus-fixed-fee contractor, *unless explicitly designated by the federal contract as an agent with authority to pledge the credit of the United States,*[10] qualifies as a purchaser subject to sales tax exactions. That bright line test constrains the judiciary from drawing fine distinctions in an area best left to congressional control. Courtesy, the federal contractor in this case, pledged only its own credit to the vendor, Sheraton Park. Nor does the United States argue otherwise. It has never asserted, nor could it on the basis of the Government contract in the record, that Courtesy had authority to pledge the credit of the United States. Lacking such authority, Courtesy cannot rank as a "purchasing agent" for the United States. Courtesy purchased on its own account and, as is generally the case with cost-plus-fixed-fee contractors, thereafter passed the cost onto the Government.

In addition to *King & Boozer,* the district court considered as relevant authority *Unit-*

---

8. The dissent in *Kern-Limerick* criticized the Court's analysis because it would "permit any government functionary to draw the constitutional line by changing a few words in a contract." 347 U.S. at 126, 74 S.Ct. at 412 (Douglas, J., dissenting). *Cf. United States v. Township of Muskegon,* 355 U.S. 484, 486, 78 S.Ct. 483, 485, 2 L.Ed.2d 436 (1958) (if formal contract designation of one party as lessee were dispositive, "immunity could be conferred by a simple stroke of the draftsman's pen"). *See also* Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism,* 89 Harv.L.Rev. 682, 710 (1976) ("To find immunity because the federal executive has included certain terms in its contract seems wholly unjustifiable."). *But cf. United States v. New Mexico,* 624 F.2d 111, 116 n.5 (10th Cir. 1980) ("Although we are skeptical of cosmetic provisions drafted by government functionaries, we must find immunity when these contracts inherently and inexorably draw a private corporation so close to the government as to make it a servant."), *cert. granted,* 450 U.S. 909, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981). The Government contract in this case, however, plainly does not fall within the *Kern-Limerick* fold. It contains nothing resembling the language held to immunize purchases in that case. It neither authorizes Courtesy to obligate the Government to the vendor for the procurement, nor does it render the Government directly obligated to the Sheraton Park for the accommodations and meals.

9. Although the sales tax is imposed on the vendor, D.C.Code § 47–2602, the purchaser is obligated by statute to reimburse the vendor for the amount of tax. *Id.* § 47–2603. The legal incidence of such a tax is on the purchaser. "[W]here a State requires that its sales tax be passed on to the purchaser and be collected by the vendor from him, this establishes as a matter of law that the legal incidence of the tax falls upon the purchaser." *United States v. Tax Comm'n,* 421 U.S. 599, 608, 95 S.Ct. 1872, 1878, 44 L.Ed.2d 404 (1975).

10. A pledge of the Government's credit may have more than formal significance. It can be important to a vendor or subcontractor in the event that the contractor is unable to pay for the goods or services.

ed States v. Livingston, 179 F.Supp. 9 (E.D. S.C.1959) (three-judge court), aff'd per curiam, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). The court apparently believed that Livingston justified characterization of the procurement here as a "direct purchase" by the United States. Livingston held immune from South Carolina sales and use tax the purchases of a contractor performing management services for the Atomic Energy Commission who undertook the work not for profit, but as a contribution to the defense effort. The district court, although it attempted to draw support from Kern-Limerick, relied heavily on the fact that the contractor accepted only a one-dollar fee for its services. 179 F.Supp. at 16–22. The Supreme Court later treated Livingston as confined to its specific facts, noting the " 'extraordinary' contractual relationship between [the contractor] and AEC." United States v. Boyd, 378 U.S. 39, 45 n.6, 84 S.Ct. 1518, 1522 n.6, 12 L.Ed.2d 713 (1964). The Court held in Boyd that purchases of another AEC management services contractor were subject to state contractor's use tax: "Because the services involved herein are performed for a substantial fee in the course of the contractor's commercial operation the Livingston decision is not controlling." Id. Similarly, Livingston is not controlling in this case. Courtesy undertook the work, not as a patriotic gesture, but for a substantial fixed fee.

■ Had the conference Courtesy was engaged to facilitate taken place in Annapolis or Williamsburg, we would be obliged to hold that federal law does not bar Maryland or Virginia from imposing a tax on the space and food sold by the hotel. To rule otherwise would ignore, as the dissenting opinion consistently does, the emphasis the Supreme Court has placed on a pledge of the Government's credit as the key indicator of immunity. Because the conference took place in the District of Columbia, however, we must determine whether, as the

United States argues, the D.C. sales tax exempts transactions outside the scope of federal tax immunity. Only two of the several D.C. sales tax exemptions are relevant to this controversy. One is D.C.Code § 47–2605(m), which exempts "[s]ales which a State would be without power to tax under the limitations of the Constitution of the United States." As explained above, the Constitution would not prevent a state from taxing the procurement at issue here, so this exemption provides no support for the restitution claim the United States asserts.

■ The other exemption is section 47–2605(a), which exempts sales to the United States.[11] The United States contends that "this exemption is broader than the scope of the constitutional immunity of certain sales from state taxation." Brief for the Appellee at 7. The District of Columbia, on the other hand, maintains that the exemption is coextensive with constitutionality based federal tax immunity. Without calling our attention to any precedent specifically in point, the United States advances three arguments in support of its position.

First, the United States urges, section 47–2605 exempts certain sales "without regard to . . . whether [they] would be constitutionally immune from state sales taxation." Brief for the Appellee at 21. As an example, the United States cites D.C.Code § 47–2605(q), which exempts sales of materials to be incorporated permanently in any war memorial authorized by Congress to be erected on public grounds of the United States. The drift of this argument is not readily apparent. Congress exempted a variety of sales from the tax, but the policies behind other exemptions shed no bright light on the intended scope of exemption (a).

Second, the United States argues that because another provision, section 47–2605(m), already exempts sales that could

---

11. D.C.Code § 47–2605(a), set out below in full, covers:

    Sales to the United States or the District or any instrumentality thereof except sales to

national banks and Federal savings and loan associations.

not be taxed were the District of Columbia a state, exemption (a) must go further. But nothing indicates that the exemptions were drawn with meticulous care to avoid any overlap. Moreover, it appears that Congress, when it adopted exemption (m), did not focus specifically on federal tax immunity. The only reference to exemption (m) in the legislative history suggests that Congress had in mind the limits imposed by the interstate commerce clause. *See* 95 Cong.Rec. 6083 (1949) (statement of Sen. Hunt, sponsor of the legislation). The exemption (m) administrative regulations also suggest only commerce clause considerations. *See* 16 D.C.R.R. § 203.1(*l*).

The United States further relies on an administrative regulation interpreting exemption (a), 16 D.C.R.R. § 203.1(a), which provides:

> Sales to the United States or the District or any instrumentality thereof. For the purposes of this exemption, vendors may treat as nontaxable the receipts from, and shall be relieved from the duty of collecting their reimbursement for tax on, sales to the United States and to the District of Columbia on any purchase order made by an authorized purchasing officer or by contract in which either the United States or the District of Columbia or any instrumentality of either Government is a party.

It is hardly evident that this regulation indicates a broadened scope for the United States' tax immunity; the regulation can as readily be read as an attempt to codify federal tax immunity precedent.

Since the text of the exemption for sales to the United States does not supply an altogether crisp response to the parties' contentions, the legislative history of the D.C. sales tax bears consideration. The District of Columbia Sales Tax Act was enacted in 1949 as Title I of the District of Columbia Revenue Act of 1949, Pub.L.No.81–76, 63 Stat. 112. The notion of a sales tax, however, had been ripening for some time. Ten years earlier, the House of Representatives commissioned Dr. Chester B. Pond to conduct a study of the tax structure of the

District of Columbia. Although Dr. Pond recommended the enactment of a sales tax as part of a comprehensive revision of the D.C. tax laws, *see* H.R.Doc.No.108, 76th Cong., 1st Sess. 105 (1939), the idea proved controversial. For a decade, sales tax proposals, introduced in a number of revenue bills, were consistently defeated.

When the sales tax finally passed in 1949, congressional attention still centered on the wisdom of such a tax as a method to raise revenue. Exemptions from the tax did not receive the focused scrutiny of Congress, either in committee reports or floor debate. One clear theme is sounded throughout the legislative history, however: Congress intended to place the District on an equal footing with the states. The Senate Report stated, "The provisions of title I of this bill impose a sales tax for the District of Columbia, which is predicated upon the same theory as are the sales-tax laws of many states." S.Rep.No.260, 81st Cong., 1st Sess. 7, reprinted in 1949 U.S.Code Cong.Serv. 1297, 1304. The House Report contained identical language. H.R.Rep.No.315, 81st Cong., 1st Sess. 2 (1949). The Senate Report also quoted from Dr. Pond's 1939 study:

> For practical purposes, it is necessary to view the District as a State. Regarded in this light, it follows that the limitations placed upon State taxing power should apply.

S.Rep.No.260, 81st Cong., 1st Sess. 4 reprinted in 1949 U.S.Code Cong.Serv. 1300 (quoting H.R.Doc.No.108, 76th Cong., 1st Sess. 102 (1939)).

Thus, although the legislative history does not specifically address exemption (a), it does display a clear purpose to pattern the D.C. sales tax on state sales tax laws and to limit the District's taxing power in the manner that state taxation authority is limited. The 1949 act was directed toward restoring the fiscal integrity of the District. No reason has been suggested why Congress would be less sensitive to the impact of an expansive federal immunity on the District's treasury than Congress has been with regard to the fiscal interests of the states. *See United States v. New Mexico,*

*supra*, 624 F.2d at 116: "Congress, openly sensitive to the impact on state treasuries, has not extended tax immunity to any class of contractors." We therefore conclude that exemption (a) is, as the District maintains, coextensive with constitutionally based federal tax immunity.

■ That should be the end of the inquiry. The United States, however, has tendered a further argument premised on 16 D.C.R.R. § 203.1(a), which exempts sales by contract to which the United States or any instrumentality thereof is a party. As the United States reads the regulation, and now construes the facts, there is a dispositive contract bar to the tax at issue.

In this court, the United States featured beyond other arguments the contention that the Sheraton Park's sale of space and food was pursuant to a contract the United States had concluded with the hotel, before Courtesy entered the picture.[12] The United States never asserted the existence of such a contract to the district court; the argument appears for the first time on appeal. After examining the record, we conclude that no such contract existed.

The sole support in the record for the existence of a contract between the United States and the Sheraton Park is a vague reference, in the contract between Courtesy and the United States, A91, to the "satisfactory completion of [the hotel's] contract with the White House Conference." Although the White House Conference was sometimes referred to as an entity, it was in fact an event. Thus, there is slim reason to assume that the words "White House Conference" were intended as a synonym for "United States." The reference could as readily be understood to mean the hotel's contract with Courtesy.

In contrast, the contracts between the United States and Courtesy and between Courtesy and the Sheraton Park are not in doubt. The United States-Courtesy con-

tract is specific in its provisions: Courtesy was responsible for paying the vendor for the rooms and meals, ¶ IV.D.3, A91; Courtesy could seek reimbursement only for expenses actually incurred, ¶ VIII.6, A98, that is, only after it paid the hotel. In accordance with these provisions, the hotel billed Courtesy for the accommodations and meals; Courtesy paid the bill, after Department of Commerce approval; and the Department reimbursed Courtesy.

An official of the Department of Commerce, Jerry Manolatos, engaged in discussions with the hotel before selection of Courtesy as the contractor. The United States attempts to argue that these discussions formed the basis for a contract. But as far as the record indicates, Manolatos did not sign the hotel's proffered "letter of agreement." A74. Instead, he merely restated the intended conference dates and preliminary plans for the event, noting that he was "working with the Procurement Division to develop a contract for Conference management and logistics." A75. The reason for Manolatos' circumspection seems evident: as the Contracting Officer's Technical Representative, Tyler aff., A68, he had no authority "to make any commitments or otherwise obligate the Government or authorize any changes which affect the contract price, terms or conditions." A97. In dealings with the Federal Government, the rule is familiar: only those specifically delegated contracting authority may bind the United States. *See* 41 C.F.R. § 13–1.450–1(c): "Personnel not delegated contracting authority may not commit the Department, formally or informally, to any type of contractual obligation either before or after contract award." The Government does not assert, even now, that Manolatos, *the only Commerce Department official alleged to have negotiated with the Sheraton Park*, had any authority to enter into a contract on behalf of the United States.[13]

---

**12.** The argument lacks force, for the administrative regulation on which the Government relies cannot expand the scope of the exemption beyond that provided by statute. *See Dis-*

*trict of Columbia v. Payne*, 374 F.2d 261, 265 (D.C.Cir.1966).

**13.** Because Manolatos lacked actual authority to contract on behalf of the United States, the

Even under principles of contract law generally applicable to private parties, the Manolatos-Sheraton Park communications would not appear to amount to a contract. Although Manolatos had specified dates and discussed room availability with the hotel, he never worked out the details of the undertaking. The record is clear that Courtesy had full responsibility for determining the exact prices and quantities of space and food procured: "After consummation of the [U.S.-Courtesy] contract, Courtesy assumed all responsibility for firming up and arranging for all Conference goods, services and facilities, *including the negotiating* and firming up *of prices and quantities* of space and food being procured from the Sheraton Park." Tyler aff. ¶ 5, A69 (emphasis added). *See also* Stampfli aff. ¶ 11, A59. Manolatos, the record suggests, merely opened the negotiations and set part of the foundation upon which Courtesy subsequently executed a contract with the hotel.

We conclude that the space and food were not sold "by contract in which . . . the United States . . . [was] a party." Thus, even under the D.C. regulation (16 D.C.R.R. § 203.1(a)) as read by the United States, the sale in question would not be exempt from taxation. Courtesy was not designated by contract as a "purchasing agent" for the United States and, most importantly, Courtesy had no authority to pledge the Government's credit. We therefore reverse the judgment of the district court and re-

mand the case with instructions to enter judgment for the District of Columbia.[14]

*It is so ordered.*

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

I concur in the majority opinion insofar as it holds that the district court had subject matter jurisdiction, but dissent from the conclusion that the District of Columbia sales tax was properly levied on the hotel accommodations in question. These accommodations, consisting of meeting rooms, sleeping rooms, and meals, were furnished directly to the government and to the participants who were invited by the United States to attend the White House Conference on Balanced National Growth and Economic Development at the expense of the United States. In my judgment the majority fails to recognize the fundamental fact that the transaction here was one involving the government, directly and through the acts of its agents, as a party to a sale.

When the concrete facts of this case are considered, it becomes clear that the District of Columbia has levied a tax the legal incidence of which is upon the United States government. The record shows, and no amount of logic can deny, that Courtesy was here acting purely as the government's agent. The Conference, and implicitly the purchase of hotel accommodations with which we are here concerned, was first au-

Government would not be bound by his representations, for the doctrine of apparent authority generally does not apply to dealings with the Government:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. . . . And this is so even though . . . the agent himself may have been unaware of the limitations on his authority.

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1974), *cited with approval in Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam).

The dissenting opinion strays from the record in supposing that Commerce Department officials and representatives other than Manolatos

engaged in negotiations with the Sheraton Park, and it conveniently ignores Manolatos' incapacity to bind the United States to any agreement. We cannot will away the plain fact that there is only one United States purchase contract in this picture: a contract to purchase Courtesy's services.

14. No material facts are in dispute. The undisputed facts demonstrate the absence of a contract between the United States and the Sheraton Park and the absence of any authority in Courtesy to pledge the credit of 'the United States. We therefore conclude that the District of Columbia, although it did not move for summary judgment in the court below, is entitled to such a judgment as a matter of law. *Jenkins v. Civil Service Comm'n*, 460 F.Supp. 611, 612 n.1 (D.D.C.1978); C. Wright & A. Miller, Federal Practice and Procedure § 2720 (1973).

thorized by a specific Act of Congress. Then, in direct dealings between the United States (*i.e.*, the Department of Commerce) and the Sheraton-Park Hotel (Hotel), the principal details of the Hotel accommodations were agreed upon. Only after this initial agreement did the Department of Commerce (Commerce) and Courtesy, Inc., (Courtesy) enter into a "management and logistics" contract to follow up on the arrangements already made between Commerce and the Hotel and to furnish certain additional services as needed by the Conference. Courtesy, negotiating openly on behalf of the United States operating as the "White House Conference" (Conference), then made the final arrangements for the necessary hotel accommodations. *See United States v. Livingston*, 179 F.Supp. 9, 22 (E.D.S.C.1959) (three judge court), *aff'd per curiam*, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). Thus, insofar as the hotel accommodations were concerned, the contract with Courtesy merely adopted the principal arrangements for the Conference previously agreed upon between the Hotel and the "White House Conference" acting through an official of the Department of Commerce who was charged with getting the Conference under way. I would hold that the hotel accommodations were exempt from the D.C. sales tax as a "sale[ ] to the United States" under D.C.Code § 47–2605(a) (1973), *recodified as* § 47–2005(1) (1981) and affirm the judgment of the district court.

The District of Columbia Code provides that gross receipts from "[s]ales to the United States" are exempt from the sales (gross receipts) tax. D.C.Code § 47–2605(a). The regulations under this statutory exemption for sales to the United States state more specifically:

Part 203 *Exempt and Nontaxable Sales.* Sec. 203.1—Exempt and Nontaxable Sales—Gross receipts from the following sales shall be exempt from the tax imposed by the Act.

(a) Sales to the United States or the District or any instrumentality thereof. For the purposes of this exemption, vendors may treat as nontaxable the receipts from, and shall be relieved from the duty of collecting their reimbursement for tax on, *sales to the United States ... on any purchase order made by any authorized purchasing officer or by contract in which ... the United States ... or any instrumentality [thereof] ... is a party.*

16 D.C.R.R. § 203.1 (emphasis added).

The majority holds that these provisions state an exemption from the D.C. sales tax no broader in scope than the immunity afforded by the Constitution itself. The very structure of the majority's analysis—reaching the constitutional issue *before* deciding the question of statutory interpretation—anticipates the problems it soon encounters. For by imposing its novel constitutional analysis upon the case before treating the statutory exemption, the court poses the statutory question in a way that assumes its conclusion.

The entire statutory analysis is cast solely in terms of whether the D.C. Code provision is "coextensive" with the *majority's reading* of the constitutional scope of tax immunity. The majority first holds that the constitutional immunity extends only to contractors "specifically designated" as purchasing agents; second, it holds that the D.C. Code must be read as simply codifying the constitutional rule. It then deduces that the Code must therefore exempt only sales to "specifically designated" agents. This tidy syllogism simply begs the question of how the D.C. Code could have enacted a gloss on the Constitution that no court has ever—until today—accepted.

I would follow the wise custom of deciding the statutory question before reaching out to consider an issue of constitutional magnitude, and hold that the statute here exempts this transaction from the D.C. gross receipts tax. The record shows that the transaction in question here was a "sale to the United States" under the statute. The facts demonstrating that Courtesy was a "purchasing agent" within the regulation interpreting the statutory exemption are discussed in some detail below. However,

because the court chooses to cast its statutory analysis in terms of the "coextensiveness" of the constitutional and statutory provisions, it is first necessary to show that the Constitution does *not* compel the restrictive reading of the statutory exemption adopted by the majority.

## I

The majority's theory of constitutional tax immunity rests upon the premise that "in view of the potential impact on the revenue bases of the states, the judgment [to confer tax immunity] should be made by the national legislature," not by the executive branch. At 744. Congress, it stresses, must be left "free from ... executive intrusion" in determining whether a state's (here, the District's) power to tax is to be subordinated to particular federal interests. *Id.* at 743. This theory, whatever its merits in the abstract, is plainly an inaccurate (or, if accurate, then an incomplete) description of the law, as an examination of the relevant Supreme Court precedents makes evident. In its attempt to remedy the flaws in its analysis, the majority produces a rule of decision that is at odds with the law and logic of controlling Supreme Court doctrine.

The court begins by positing, without offering any support in law,[1] a theory of exclusive congressional authority in the area of tax immunity. Unless and until Congress has itself positively conferred tax immunity, runs the theory, the courts are powerless to conclude that a state tax levied against a government contractor is one upon the government. The majority's initial premise, then, takes the form of a constitutionally mandated "bright line" drawn to protect the exclusive authority of Congress to decide which federal activities are to be afforded immunity from state taxation.

The majority then declares that this "bright line" is a function of the legal incidence of the state tax involved, legal incidence being the established constitutional litmus for immunity. At 744. While this *conclusion* may appear to state the law of tax immunity as declared by the Supreme Court, the inadequacy of the majority's explanatory *theory* is readily apparent from its efforts to reconcile those decisions with the analytical framework it has created from whole cloth. The court, in attempting to reconcile the case of *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), is forced to depart significantly from the foundation of its analysis.

In *Kern-Limerick*, the government contractor was given contractual responsibility to "handle all payments" to suppliers. 347 U.S. at 119, 74 S.Ct. at 409. Consequently, it appeared to be, under the applicable state law, the party upon whom the legal incidence of the gross receipts tax there involved fell. 347 U.S. at 111, 74 S.Ct. at 405. The Court, however, held that the Constitution prohibited the tax from being levied upon the contractor. Its reasoning was that since the federal contract explicitly provided that the United States was to be "obligated" to perform its contractor's duties, the contractor was acting merely as the government's purchasing agent; the incidence of the tax, therefore, actually fell upon the United States as principal. Attempting to reconcile this result with its own general theory of immunity, the majority lays down the narrowest possible rule that will cover the case. It is that in instances in which the contractor is "*explicitly designated by the federal contract as an agent with authority to pledge the credit of the United States,*" the incidence of the tax paid by the contractor shall be deemed to fall on the United States. At 744. Since the contract between the government and Courtesy in the present case contains no

---

1. In this regard it is interesting to note that Professor Tribe, upon whom the majority places principal reliance, willingly concedes that existing authority flatly contradicts the theory of immunity put forth by the majority. *See* L. Tribe, American Constitutional Law, § 6–30 at 398 (1978) (*Kern-Limerick* decision, discussed *infra*, must be overruled under majority's theory). It bears repeating that sitting judges do not enjoy the fiat over Supreme Court precedent so readily exercised by their academic brethren.

such "explicit designation" of Courtesy as an agent, the majority concludes, the tax's incidence here was not upon the government.

The majority asserts that its new "explicit designation" rule is compelled by the Constitution. But to the contrary, the cases show without question that *the Constitution compels no such "explicit designation" rule at all.* The proof of this is found most readily in *Kern-Limerick* itself.

There, it was *the language of a contract drafted by the executive branch* which determined the applicability of the constitutional immunity from state taxation. While this holding is certainly consistent with the majority's announced rule that "explicit" contractual designation can confer immunity upon a government contractor, at the same time it makes plain that the power to confer that immunity is not one that must be *exercised* by Congress itself. Rather, it is one that may be exercised by the executive branch in the course of carrying out *congressionally authorized* government objectives. The question is not simply what the contract says; it is what Congress has said it *may* say.

To hold that Congress' power with respect to tax immunity may be exercised by the executive is not to say that immunity may be conferred "by the stroke of the draftsman's pen." *United States v. Township of Muskegon,* 355 U.S. 484, 487, 78 S.Ct. 483, 485, 2 L.Ed.2d 436 (1958). On the contrary, it is the majority's approach that would seem to me to "permit any government functionary to draw the constitutional

line by changing a few words in a contract." *Kern-Limerick,* 347 U.S. at 126, 74 S.Ct. at 412 (Douglas, J., dissenting), *quoted in* At 744 n.8. It is rather only to state the rule, apparent from numerous Supreme Court decisions, that it is the legal *substance* of the relationship between the government and its contractor, rather than its contractual *form,* that defines the constitutional "line" between immunity from and liability for state taxes. "[T]he duty rests on this Court to decide for itself facts or constructions upon which federal constitutional issues rest." 347 U.S. at 121, 74 S.Ct. at 410.

Just as "[c]onstitutional immunity from state taxation does not rest on such insubstantial formalities as whether the [contractor] using government property is formally designated a 'lessee,'" *United States v. Township of Muskegon,* 355 U.S. at 486, 78 S.Ct. at 485,[2] the *formal designation* (or lack thereof) of Courtesy as a "purchasing agent" cannot simply dispose of the question of whether the tax's incidence falls upon the government. Such designation may perhaps be a *sufficient* condition for so finding,[3] but it is not, in my opinion, a *necessary* one. The Constitution not only permits but requires us to determine on the basis of *all* the facts in the record whether a government contractor is indeed an agent of the government to the extent that a tax levied upon it is one falling upon the government itself. "In determining whether these taxes violate the government's constitutional immunity, we must look through the form and behind labels to substance."

**2.** In *Muskegon,* the Court found that the government contractor there was in fact free to use government property for its own commercial purposes. It thus looked beyond the formal terms of contract to inquire into the *actual* relationship between the government and the contractor. In contrast to that case, the facts here show that Courtesy was clearly acting in an agency capacity. *See* Part II *infra.*

**3.** Were a case to arise in which the federal contract "specifically designated" the contractor an agent when the acts of the contractor plainly revealed it to be acting in pursuit of its own commercial interest, *see* note 2, *supra,* it

would be necessary to decide whether the language of the contract could be held to define the constitutional dimensions of immunity. Justice Frankfurter expressed the view that in such a case, "it is *immaterial* that contracts by the Government have been purposefully drawn so as to [confer tax immunity]." *City of Detroit v. Murray Corp.,* 355 U.S. 489, 499, 78 S.Ct. 458, 488, 2 L.Ed.2d 441 (1958) (Frankfurter, J., concurring) (emphasis added). Since that situation is not presented here, it is not necessary to reach the question of whether the terms of a contract may by themselves confer an immunity that would otherwise be lacking.

*City of Detroit v. Murray Corp.*, 355 U.S. 489, 492, 78 S.Ct. 458, 460, 2 L.Ed.2d 441 (1958).[4]

The majority is of course aware that the principle of exclusive congressional authority must be tempered in order to permit the executive sufficient room to carry out Congress' directives. It offers "explicit designation" as a rule by which the courts are to gauge whether the executive has exceeded the bounds of its authority, apparently in accordance with the view that "[w]hile Congress may confer immunity with a word, an executive agency must clearly manifest the principal-agent relationship with all its ramifications" if immunity is to be found. *United States v. New Mexico, supra,* 624 F.2d at 121. I have little quarrel with the principle thus stated. But the majority would make "explicit designation" the *sole* test for evaluating the executive's use of its authority. For me, a "clear manifestation" can emerge, as it does here, equally well from the acts of the parties to a contract as from the language they employ.

Where there is serious doubt as to whether the government's immunity is sought to be improperly conferred on the private activities of a government contractor, the majority's "bright line" can serve to ensure that private interests do not enjoy a privilege which only the government may enjoy. However, just as the mere presence of such language cannot conclusively resolve such doubts in favor of immunity where it is clear that a contractor does not act as the government's agent, its absence should not lead mechanically to the conclusion that immunity is inapplicable. In short, where all the factual circumstances of a case make it plain that the incidence of a tax is upon the government, *the relevant "bright line" has already been drawn by those facts.* Af-

firmative contractual language may tend to buttress a conclusion that immunity is applicable, as it did in *Kern-Limerick*, just as negative language may support the opposite inference.[5] But I simply cannot see any justification for permitting the *absence* of plain contractual language to reverse a conclusion otherwise compelled by the plain facts of the case.

The Supreme Court's decisions in this area at once deny that form governs over substance in determining the legal incidence of a tax and establish that the executive may be empowered to carry out the business of government by electing or declining, as it sees fit, to appoint contractors as agents of the government. *See Kern-Limerick*, 347 U.S. at 114, 74 S.Ct. at 406 (under act of Congress so providing, Navy could "use agents other than its own official personnel, to handle the *detail of purchase*" (emphasis added)). Such decisions, when they are made within the contours of applicable congressional directives, pose no threat to the constitutional "mediating role" of Congress in reconciling state and federal interests. They are properly viewed as falling within the scope of the executive's authority to implement the laws. "When there is no prohibition of a particular type of contract and no direction to use a particular type, the contracting officers are free to follow business practices." *Id.* at 116, 74 S.Ct. at 407.

In the instant case, far from there being a specific congressional "prohibition" or "direction" regarding the contracts to be let in arranging the Conference, we have a specific congressional command to the President to call the Conference and to

> use appropriated funds *and act as may be necessary and appropriate* without regard to the provisions of section 551 of Title

---

4. "In this domain," wrote Justice Frankfurter, "it is asking too much for rules of certainty and simplicity in application that are hardly to be found in any live branch of law." *City of Detroit v. Murray Corp.*, 355 U.S. at 496, 78 S.Ct. at 486 (Frankfurter, J., concurring). That is precisely the request the majority makes in

propounding its "explicit designation" rule, a rule the rigidity of which does not, in my opinion, serve the true constitutional purposes of federal immunity from state taxation.

5. *See, e.g., United States v. Forst,* 442 F.Supp. 920, 924 (W.D.W.Va.1977), *aff'd,* 569 F.2d 811 (4th Cir. 1978) (per curiam).

31, U.S. Code, section 34 of Title 40, U.S. Code and section 5, Title 41 U.S. Code.[6] Pub.L. 95–31 § 202(d), 91 Stat. 170 (1977) (emphasis added).[7] Congress' request to the President to call the Conference, and its grant of authority to use appropriated funds *and act as may be necessary or appropriate* without regard to statutory provisions that normally restrict the executive in the means it may employ to carry out acts of Congress in awarding government contracts,[8] leave no doubt about the *authority* of the Department of Commerce to enter into all "necessary and appropriate" contracts for the Conference, including the one with Courtesy.[9] Under the legislation authorizing the Conference, Commerce was "free to follow business practices," *Kern-Limerick*, 347 U.S. at 116, 74 S.Ct. at 407, including the retention of Courtesy as its agent. The majority's claim that a finding of immunity would somehow threaten Congress' power in the immunity field is entirely undermined by this evidence showing that Congress specifically chose to delegate its power to the capable discretion of the President. One need not argue with the majority's view that tax immunity is "an area best left to congressional control," At 744, to conclude that here, Congress has in the interest of expediency explicitly *relinquished* its control over the Conference.

In short, there is no reason to suppose that Congress' authority must be preserved against Congress' *own decision* to delegate that authority. The majority's "bright line" ultimately serves only to create a dilemma: either it would, in the name of exclusive congressional authority, place unreasonable limits upon Congress' ability to pursue its policies by granting the executive the power independently to make contracts naming agents; or it would permit the executive unfettered discretion to create tax immunity simply through a "stroke of the draftsman's pen" expressly naming a contractor as an agent. The "explicit designation" rule would compel the adoption of one or the other of these alternatives, neither of which is the law of the land. The proper middle course is steered by an analysis which focuses upon the degree of discretion vested in the executive by Congress, and, finding such discretion, upon the relationship between the government and its contractor established by the factual circumstances.

Having concluded that Congress here intended the President to have broad authority over the conduct of the Conference, I proceed to consider whether Courtesy acted as the agent of the government under its contract.

6. The three statutory exemptions referred to removed, respectively, the prohibition upon the use of federal money for lodging, feedings, conveying or furnishing transportation to conventions; a restriction upon the rental of buildings within the District of Columbia; and a requirement that government purchases of or contracts for supplies be publicly advertised.

7. The breadth of the authority Congress sought to confer on the President is made still more evident when the history of this measure is considered. Originally, Congress requested the President to call the Conference within one year of the authorizing legislation, and granted him various powers in order to carry out that request. Pub.L. No. 94–487, 90 Stat. 2331, 2339–40 (1976). Subsequently, however, Congress found it necessary to extend the preparation period, and to broaden the President's authority by inserting the "act as may be necessary and appropriate" language into the legislation. The conclusion to be drawn is that Congress consciously chose to grant the President *exceptionally broad discretion* in calling and conducting the Conference as expeditiously as possible. That vested discretion must be read to include the power to appoint agents such as Courtesy.

8. The statute is in this respect closely similar to the one involved in *Kern-Limerick*. See 347 U.S. at 113 n.3, 74 S.Ct. at 406 n.3.

9. Besides the removal of restrictions in the *second* Act quoted in text, the *original* enabling Act also suspended the application of a statutory restriction on government contract awards, relating to the employment of personnel in the competitive civil service. Pub.L. No. 94–487 § 202(5), 90 Stat. at 2340 (1976). A suspension of the otherwise applicable requirement that the President rely on civil service personnel is strongly indicative of Congress' intent to grant him a free hand in employing private parties as agents of the government for the purposes of organizing the Conference.

## II

The nature of the immunity question does require the initial application of principles beyond those traditionally governing the question of agency. *United States v. New Mexico, supra,* 624 F.2d at 116. What the majority fails to recognize is that once the constitutional question of the executive's *authority* to invoke immunity from state taxation is established—as it is here by the Act's authorizing the President to organize the Conference free from normal constraints on the letting of government contracts—the question of whether the executive *has in fact created* an agency relationship can be decided by reference to the traditional principles of the law of agency. The majority conflates these two inquiries by imposing a constitutional litmus—does the executive have *authority* from Congress—upon the nonconstitutional question of whether that authority has been *exercised.*

Nothing in the majority's basic premise of congressional control over the invocation of immunity requires a rule that the immunity can be conferred only by explicit contractual language creating an agency relationship.[10] I am compelled to suggest that it is the *ultimate fact* of the contractor's agency, and not the mere *form* of its contract with the government, that is determinative. The record in this action presents a compelling case for the conclusion that Courtesy did act as the government's purchasing agent, and consequently that the transaction was exempt as a "sale to the United States."

The organization of the Conference was delegated to the Department of Commerce, and *its officials* promptly proceeded to negotiate for a Conference site. *Prior to September 1, 1977,* the active officials of Commerce selected the Sheraton-Park Hotel as the site of the Conference. Stampfli Aff. ¶ 3 (App. 57–58). These early negotiations between representatives of Commerce and the Hotel settled upon the dates of the Conference, the number and nature of meeting and sleeping rooms and meals that would be necessary, and the cost of most of the items—in short, upon most of the essential terms that any contract for the Conference would contain. The Hotel then requested Manolatos, who was in charge of the Conference at Commerce, to sign a copy of the Hotel's August 2, 1977 "letter of agreement."[11] The record does not disclose whether Manolatos signed and returned a copy of this letter. It does show equivalent acceptance by his answering letter of August 11, 1977, in which Manolatos responded to the Hotel, stating:

> We are pleased to *confirm* our understanding of *the agreement reached to date between the White House Conference on Balanced National Growth and Economic Development and the Sheraton Park Hotel.* [This characterizes an agreement as having been reached between the Hotel and the "White House Conference."]

> It is our intent that the Conference will be held at the Sheraton Park Hotel from January 28 through February 2, 1978.

> Meeting rooms and accommodations *are reserved* and available for the Conference as specified in correspondence from the Sheraton Park Hotel, dated June 15, July 7, July 22, and August 2, 1977, with the addition of the availability of the Sheraton Park ballroom until 5:00 p.m. on February 2, 1978. [This indicates substantial agreement].

> We are currently working with our Procurement Division to develop a contract for Conference management and logis-

---

10. Indeed, the majority's theory would be better served by requiring simply that government contracts carry the legend "immune from taxation." If such a rule would equally well realize the majority's goal of preserving congressional authority in this area, then I fail to see why facts otherwise clearly establishing the existence of an agency relationship must be disregarded.

11. *Id.,* Tyler aff. and exhibits. *See* Letter of August 2, 1977 from Hotel to Assistant Director for Conference Operations Mr. Jerry Manatolos: "This letter of agreement between us commits the dates, the room blockage, and complimentary policy." App. at 74.

tics, *which will incorporate the items specified in your correspondence to us,* the accommodations and meal costs, services to be provided by the hotel, and other items to be clarified within the next few weeks.

(App. 75) (emphasis added). The agreement as to dates also implicitly blocked out the number of bedrooms necessary to serve the intended number of invitees.

As contemplated by Commerce and the Hotel (App. 74), a contract was subsequently entered into on September 30, 1977 between Commerce and Courtesy. That contract had the purpose of simply *"firming up and arranging for all Conference goods, services and facilities, including the negotiating and firming up of prices and quantities of space and food being procured from the Sheraton Park."* Tyler Aff. ¶ 5 (App. 69) (emphasis added).

Thus, as stated above, the broad outline of the hotel services for the Conference and its participants were worked out between the Hotel and the representative of the Department of Commerce *before* the government entered into its contract with Courtesy. That contract, entered into on September 30, 1977, was backdated to an effective date of September 16, 1977. It also incorporated the earlier arrangements between Commerce and the Hotel and indicated, insofar as the arrangements with the Hotel for rooms and meals were concerned, that the parties intended to *ratify the earlier contractual arrangements between the Hotel and the "White House Conference*:

"3. *Post-Conference*

Post-Conference activities of the Contractor will include, but not necessarily be limited to, the following:

a. *Hotel*

Complete all arrangements for payment to hotel having determined the satisfactory completion of *their contract with the White House Conference."*

(App. 91) (emphasis added). The word "their" refers to the Hotel since "hotel" is the last (indeed, the only) antecedent. *Azure v. Morton,* 514 F.2d 897, 900 (9th Cir. 1975); *Quindlen v. Prudential Insurance Company of America,* 482 F.2d 876, 878 (5th Cir. 1973); *Mandina v. United States,* 472 F.2d 1110, 1112 (8th Cir.), *cert. denied,* 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973); *United States v. Pritchett,* 470 F.2d 455, 459 (D.C.Cir.1972). This reference in the contract between Courtesy and the Hotel therefore adopts the provisions of the prior agreement reached by the Hotel and Commerce.

On January 3, 1978, Courtesy *"confirmed the arrangements for the procurement for the space and food"* that had been reached, prior to Courtesy's contract, between the officials of Commerce and the Sheraton-Park. (App. 58, ¶¶ 3, 4, 6). If there were any doubt about the terms of the contract between the Hotel and Commerce, acting for the United States as the "White House Conference," the contract between Commerce and Courtesy ratifies that arrangement. But more important, that ratification indicates that Courtesy was acting as an agent for Commerce. The majority seek to avoid this interpretation and the clear implications of the reference to the Courtesy contract as the "contract with the White House Conference," but, in addition to the reference in the contract, to the extent that there is any additional record evidence it also indicates that goods and services were billed to the "White House Conference"—not to Courtesy. (App. 61–62). The contract with Courtesy also expressly incorporated the dates and much of the agenda for the Conference that had been previously negotiated by Commerce personnel (App. 71–72, 82–83) and implicitly adopted the agreements on rooms for meeting and housing and feeding guests (App. 69, 82–84).

An important fact distinguishing this case from the typical case in which immunity is found lacking in the absence of an explicitly created agency relationship is the subject matter of the contract involved. The contract here was essentially one for the provision of *services* rather than for the transfer of materials or other tangible prop-

erty.[12] The hotel offered accommodations and accompanying support staff, on terms which had already been worked out between the hotel and the government. The contract is thus distinguished from those at issue in *King & Boozer* (contract for sale of building materials), *United States v. New Mexico* (contract for "long term" management of AEC facility vested "substantial autonomy" in contractor, and *Harvey F. Gamage, Shipbuilder, Inc. v. Halperin*, 359 A.2d 72 (Me.1976) (contract for construction of private fishing vessel), in which the courts found that immunity was unavailable.

As the court pointed out in *United States v. Livingston, supra*, the principal concern in such cases involving tangible property is that the contractor may make use of the property for purposes other than the government's benefit. "The vital thing" in cases denying immunity has been that the contractors used government property for the pursuit of private commercial purposes *unrelated to the government contract. United States v. Township of Muskegon*, 355 U.S. 484, 486, 78 S.Ct. 483, 485, 2 L.Ed.2d 436 (1958). *See, e.g., Harvey F. Gamage, Shipbuilder, Inc. v. Halperin, supra* (even though contract *directly obligated* United States to pay costs of constructing ship, immunity did not attach because ship was used in private commercial enterprise). A private party may not enjoy the immunity lawfully available only to the government. Hence, the presence of contractual terms ensuring that the government is the exclusive beneficiary of the immunity—as where the contractor is a mere agent of the government—has been strongly persuasive of the existence of immunity. But where, as here, the *subject* matter of the contract makes it certain that the government is the only party who *can* receive the benefit of what it purchases, there is likewise little need to worry that the contractor has ap-

propriated the government's immunity. The substance of the contract, in short, can be just as persuasive as its explicit terms. "An agent ... need not be called by that name to be one." *United States v. Livingston, supra*, 179 F.Supp. at 22.

The majority opinion attempts to place this case in the context of the construction contracts entered into by the United States that were involved in *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 482 (1941) and *Kern-Limerick, Inc. v. Scurlock, supra*. These cases turned respectively on whether the government was "obligated to pay" for lumber and whether a contractor was "authorized to pledge the credit of the United States." But both of those cases involved *construction contractors* and items of *tangible personal property* which were purchased in connection with the projects, and hence present the agency question in a significantly different form. The contract here is essentially a *service* contract and *none* of the items that are alleged to be subject to the D.C. sales tax, rooms and meals, were delivered to the contractor (Courtesy).

A particularly useful comparison is furnished by *United States v. Township of Muskegon, supra*, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958). There, a contractor using the government's property for its own commercial purposes as well as for performing a government contract was held unable to invoke the federal government's immunity. The Court noted that "[t]he case might well be different if the Government had reserved such control over the activities and financial gain" of the contractor that the contractor could have been deemed a "servant." *Id.* at 486, 78 S.Ct. at 485. In the context of a contract for the provision of *services* to the government contractor like the one involved in this case, the government without question retains "control" of its "property" to an extent that makes it

---

**12.** The hotel accommodations were only one part of the Courtesy contract constituting about one-third of the total cost. In addition Courtesy agreed to perform numerous chores for the Conference: furnish clerical and secretarial support, cash invitees' checks, arrange walkie-talkie communications, prepare signs, provide security, photocopy service, maintain pressroom, local transportation for invitees, arrange hospitality activities, and the like (App. at 84–91).

clear where the incidence of the tax falls. *See United States v. Livingston, supra,* 179 F.Supp. at 23. The nature of the contract as one for services, then, more readily supports the inference that the contractor here was acting merely as the government's agent.

According to the majority, deviation from its "explicit designation rule" is permitted only in instances where a government contractor performs its services *gratuitously.* At 745 (discussing *United States v. Livingston, supra*). This is another instance of cutting the rule closely to fit the case law without regard for the broader principles those decisions sought to serve. Simple citation of the Supreme Court's *obiter dictum* in *United States v. Boyd,* 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964), for the view that the analysis in the *Livingston* case is confined to "extraordinary" factual situations does not suffice to explain the majority's apparent adoption of the view that the amount of a contractor's profit, or the patriotic nature of its motives, is dispositive of the constitutional question it poses.

In point of fact, *Boyd* was limited to the question of whether a government contractor could be held to be a purchasing agent in the context of a state tax directly on *contractors,* not upon sales. The Court explicitly stated that question of immunity from that levy, which taxed the business of contracting, was *unconnected* with the question of whether the contractor was an agent of the government. The Court therefore did not consider the Tennessee Supreme Court's holding, 211 Tenn. 139, 363 S.W.2d 193 (1962), that the contractor *was* immune as a purchasing agent. The majority's reliance on and quotation of *Boyd* is therefore misplaced.

The terms of the contract between Courtesy and the Hotel were negotiated *in advance* by Commerce leaving virtually *no room* for Courtesy to exercise any independent discretion over how the services would be provided.[13] Under the terms of its agreement with Commerce, Courtesy was acting only to "firm up" arrangements already made. For the purposes of those arrangements, then, it was, under traditional agency principles, the government's agent. Restatement (Second) of Agency § 14N (1958).[14]

In addition to not receiving any of the services that are here sought to be taxed in its name, Courtesy had "no role whatsoever" in determining who was to occupy the rooms or consume the food furnished by the Hotel. These decisions were *at all times* reserved to the officials and employees of the United States, and withheld from Courtesy. Tyler Aff. (App. 70). Its sole relationship to those logistical items (rooms and meals) was limited to overseeing the furnishing of same to the Conference and its participants—*within* the $40 and $30 contract limitations on rooms and meals (App. 93)—checking the final Hotel bill, and, *after the United States had checked the bill and approved it,* paying the approved amount to the Hotel. (App. 70). It was then reimbursed by the United States. Courtesy thus ran no practical risk in paying the Hotel bill. Throughout it was practically a servant of the United States, whose task it was to handle the "detail[s] of purchase." *Kern-Limerick,* 347 U.S. at 114, 74 S.Ct. at 406.[15] The principal decisions and arrangements with respect to the hotel accommodations were made by Commerce before it entered into the contract with Courtesy and the contract strictly limited Courtesy's au-

---

**13.** *Compare United States v. New Mexico,* 624 F.2d 111, 114 (10th Cir. 1980) (contracts for management services contemplate "long-term relationships and vest substantial autonomy in the contractors"), *cert. granted,* 450 U.S. 909, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981).

**14.** It is not inconsistent with an agency relationship that the agent has the legal status of independent contractor. Restatement (Second) of Agency § 14N, comment a (1958).

**15.** The case is thus quite unlike *United States v. Forst,* 442 F.Supp. 920 (W.D.Va.1977), *aff'd,* 569 F.2d 811 (4th Cir. 1978). In that case, the contract specifically stated that the contractor acted "as an independent contractor *and not as an agent of the Government . . .*" *Id.* at 924 (emphasis added).

thority with respect to the items upon which Commerce and the Hotel had previously agreed (App. 91).

In other words, the contract made Courtesy the chore boy for the Conference. Its authority was specifically and strictly limited by the contract; with respect to rooms and meals it was nothing more than an agent of the Commerce Department. It acted only as a supervisor or purchasing agent for the government to see that rooms and meals which had been preliminarily agreed upon between Commerce and the Hotel were furnished to the guests who had been invited by the government.[16] The number of rooms and meals had been agreed upon; Courtesy selected the menu within the contract's price restriction. *Id.*

In my view the above facts with respect to the rooms and meals constitute, under the contract, a sale to the United States—if not a direct sale, then a sale to the United States on a purchase order made by an authorized purchasing officer.

### III

In view of the foregoing it is not necessary to determine whether the negotiations between the Sheraton Park and the Commerce Department resulted in a contract for hotel services or whether such a contract was consummated only after Courtesy became a participant in the transaction. In either event, Courtesy had no discretion in determining the dates and place of the Conference and who would provide the meeting rooms, food, and lodging for the Department's Conference and who would be the recipients thereof. This is in distinct contrast to the situation in which a contractor agrees to provide some service or product for the government, such as a building, and in the course of performing his obligations purchases lumber and machinery for his own use. Indeed, Courtesy's payment for the Hotel services is distinguishable from a purchase it may have made of, for example, name identification tags for the Conference participants. Courtesy would probably not be a purchasing agent for the United States with respect to such a purchase. But where it is contractually obligated to make payment for hotel services *already substantially arranged and confirmed* by officers of the United States, the situation is distinguishable in a material respect. Where a federal contractor merely oversees the provision of goods and services to the United States, he acts as an agent for the United States and there is no basis for taxing what are, essentially, direct sales to the United States. In such case, the United States is the purchaser.[17]

---

**16.** It firmed up the details with the Hotel as to quantity and prices. *In the matter of prices its authority was limited by the $40 and $30 limits set in the contract* and the quantity of food was reduced to practically a mathematical calculation controlled by the number of participants invited by Commerce to attend. The Stampfli Affidavit states:

> 11. After the contract was signed, *Courtesy actively participated in negotiating and firming up the procurement of the space and food contemplated by the contract working out with the Sheraton-Park the particulars as to quantities and types of food to be procured (and the prices therefor) and the nature, type and number of rooms and meeting facilities to be provided (and the prices therefore).* (App. 59).

**17.** The record here evidences the mutual assent necessary to the formation of a contract between the United States acting through Commerce as the "White House Conference." In conducting the Conference the agency was specifically authorized by statute to "act as may be necessary and appropriate without regard to the provisions" of the statute requiring the advertising for bids. Whether the special Act, under which this Conference and the attendant contracts came into being, was sufficient to constitute a completely valid contract, as to the matters agreed upon by the Hotel and Commerce, under all other government contract restrictions and regulations, is not clear. *See* J. McBride & T. Touhey, Government Contracts § 4.40 (1978). However, it is not necessary to decide this issue, because whatever deficiencies may have existed were cured by the provisions in the formal contract between Commerce and Courtesy. These negotiations and their result are important because they shed light on the nature of the authority that was being conferred upon Courtesy. The recognition of the prior "contract" between the Hotel and Commerce, even if only a *de facto* contract, the very limited authority given Courtesy with respect to the rooms and meals, and the approval by Commerce of the amounts prior to payment by Courtesy, all indicate that with respect to the

The United States was clearly disclosed at all times as the real party in interest. Under the D.C. Code and the applicable Regulation, set forth above, the hotel accommodations were a "sale[ ] to the United States" through its agent. Such was the intent of the parties in referring to the "[Hotel's] contract with the White House Conference." [18] All the rooms and meals that were furnished to Conference participants as guests of the United States and the larger rooms in which the Conference meetings were conducted constituted essentially a sale to and use by the United States. There is absolutely no question whatsoever that the *meeting rooms* and services relating thereto were a direct sale to the government (App. 65).

In reaching the above conclusion, I cannot escape the plain words of the statute and assert, as the majority does, that D.C. Code § 47–2605(a) and its accompanying regulation should not be given their plain meaning because Congress in enacting the legislation did not "focus specifically" on federal tax immunity and that the exemption allegedly did not receive the "focused scrutiny of Congress." At 745–746. That would be a novel doctrine of statutory interpretation. The Supreme Court has cautioned that it is treacherous to find in congressional silence alone the adoption of a controlling rule of law. *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 241, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970); *Girouard v. United States*, 328 U.S. 61, 69, 66 S.Ct. 826, 829, 90 L.Ed. 1084 (1946). The exemption provisions are so plain that no discussion or elaboration was necessary. If statutory provisions setting forth a perfectly obvious legislative intent were to suffer because they were not debated in committee or on the floor the clearest and most basic provisions of every statute would fall.

To the extent above indicated I therefore respectfully dissent.

hotel accommodations Courtesy was a mere agent of the United States.

18. It is this "practical significance," *see* At 754 n.10, which I find relevant to the present case.